# EXHIBIT H

# United States Court of Appeals
## For the First Circuit

Nos. 12-1102, 12-1327

GLOBAL NAPS, INC.; PPUC PENNSYLVANIA PUBLIC UTILITY COMMISSION;
AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.,

Plaintiffs,

_____

QUALITY SPEAKS, LLC,

Plaintiff, Appellee,

v.

VERIZON NEW ENGLAND, INC., d/b/a Verizon Massachusetts,

Defendant, Appellee,

_____

MA DEPT. OF TELECOMMUNICATIONS & ENERGY; PAUL B. VASINGTON,
in his capacity as Commissioner; JAMES CONNELLY, in his
capacity as Commissioner; W. ROBERT KEATING, in his
capacity as Commissioner; DEIRDRE K. MANNING, in her
capacity as Commissioner; EUGENE J. SULLIVAN, JR., in his
capacity as Commissioner,

Defendants,

_____

CARL F. JENKINS,

Receiver, Appellee,

v.

FRANK T. GANGI,

Counterclaim Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, <u>U.S. District Judge</u>]

---

Before
Lynch, <u>Chief Judge</u>,
Stahl and Howard, <u>Circuit Judges</u>.

---

<u>Andrew Good</u>, <u>Good & Cormier</u>, <u>Eric C. Osterberg</u> and <u>Osterberg LLC</u> on brief for counterclaim defendant, appellant.
<u>John F. Drew</u>, <u>Andrea L. Martin</u> and <u>Burns & Levinson LLP</u> on brief for plaintiff, appellee.
<u>Donald H.C. Libbey</u>, <u>Donald H.C. Libbey P.C.</u>, <u>Steven J. Marullo</u> and <u>Law Offices of Steven J. Marullo</u> on brief for receiver, appellee.

---

January 18, 2013

---

**Per Curiam**.  Since 2002, Global NAPs, Inc. ("GNAPs") has been engaged in litigation with Verizon New England, Inc. that originally arose over access fees the two companies owed each other for interconnecting their telephone networks.  Verizon is the former local telephone monopoly in Massachusetts, known as the "incumbent local exchange carrier" (ILEC); GNAPs is a startup competitor, known as a "competitive local exchange carrier" (CLEC). Although Verizon prevailed in the underlying dispute roughly four years ago, the district court is still overseeing a receivership sale to satisfy the judgment against GNAPs.  The company's former principal, Frank Gangi, appeals to challenge an injunction the court issued in connection with that sale.  Finding no error, we affirm.

Because these consolidated cases represent the seventh and eighth appeals filed by Gangi or his former company GNAPs in the course of this decade-long litigation,[1] we recount only those facts necessary to resolve the instant dispute.

In brief, GNAPs sued Verizon over the fee issue and Verizon filed various counterclaims.  In early 2009, following serious discovery violations by GNAPs, including instances in which

---

[1] See Global NAPs, Inc. v. Verizon New Eng. Inc. (GNAPS VI), No. 10-1962 (1st Cir. Nov. 8, 2010); Global NAPs, Inc. v. Verizon New Eng. Inc. (GNAPS V), 603 F.3d 71, 76 (1st Cir. 2010) (collecting prior cases), cert. denied, 131 S. Ct. 1044 (2011).  A detailed discussion of the relevant facts may be found in our most recent substantive opinion.  GNAPS V, 603 F.3d at 78-81.

the district court found that Gangi lied and withheld or destroyed evidence, the court entered a $57.7 million default judgment in favor of Verizon. The district court also ruled that Gangi and various Gangi-controlled entities were alter egos of GNAPs and thus liable for the judgment. A panel of this court affirmed in April 2010, Global NAPs, Inc. v. Verizon New Eng. Inc. (GNAPS V), 603 F.3d 71, 95 (1st Cir. 2010), cert. denied, 131 S. Ct. 1044 (2011), and the following month the district court appointed a receiver to marshal and sell the assets of GNAPs and its alter egos.

The receiver soon began the process, although his efforts were hampered by Gangi, who, among other stratagems seemingly designed to conceal or protect his assets, apparently had transferred ownership of his $400,000 Porsche to a ten-year-old child. In any event, the receiver eventually focused his efforts on two Gangi-controlled companies other than GNAPs itself: BroadVoice and Convergent. BroadVoice offers VoIP service, which allows customers to place ordinary telephone calls over the internet, typically at a substantial savings compared to traditional phone service; Convergent designs network infrastructure hardware and software that enables connections among and between traditional telephone networks and VoIP telephone systems.

In August 2011, as a precursor to holding an auction that he hoped would lead to a final sale order from the district court,

the receiver secured a stalking horse bid for BroadVoice and Convergent. The stalking horse bidder's asset purchase agreement (APA) included the following provision:

> <u>Restraining Order Regarding Frank Gangi and Employees of GNAPs</u>. The Sale Order [ultimately entered by the district court] shall provide that Frank Gangi and any other employees or agents of the Receivership Estates shall be immediately and permanently enjoined from directly or indirectly interfering with, taking action to reduce the value of, or otherwise damaging the value of the Purchased Assets. The form and substance of such order shall be satisfactory to the Purchaser.

The receiver then filed a sale motion, which requested the court's permission to hold an auction that used the stalking horse bid as the minimum price for bidders and the stalking horse APA as the acceptable terms for bidders.

In September 2011, the district court issued an order granting the request, and the following month the receiver accepted a bid from Quality Speaks, LLC. ("QS") over competing bids from several companies, including one affiliated with Gangi. In December, over the objections of Gangi and the Gangi-affiliated bidder, the district court entered a sale order authorizing the receiver and QS to complete the transaction. In February 2012, the district court entered a supplemental order outlining the closing terms and imposing an injunction against Gangi, as contemplated by both the original stalking horse APA and the final QS APA. In relevant part, the injunction provides:

> All Persons, including the Judgment Debtors and the Judgment Debtors' Agents, and Frank Gangi and any person operating under Frank Gangi's direction or control, and any employee or agent of the Receivership Estates, are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Receiver to transfer the Purchased Assets to the Purchaser or with the operation of the Purchaser's business or its enjoyment of the Purchased Assets or from directly or indirectly interfering with, taking action to reduce the value of, or otherwise damage the value of the Purchased Assets, including any contact or solicitation of any sort with existing Broad[V]oice subscribers.

Gangi filed a timely notice of appeal from the sale order and, soon after, from the supplemental order, although in his briefs he expressly limits his challenge to the imposition of the injunction in the supplemental order. We review the district court's grant of the injunction for abuse of discretion, its underlying legal conclusions de novo, and its underlying factual findings for clear error. Contour Design, Inc. v. Chance Mold Steel Co., 693 F.3d 102, 107 (1st Cir. 2012).

We begin by addressing the receiver and QS' two-fold argument that we should not even reach the merits of Gangi's appeal. Their primary contention is that the completion of the sale to QS, which occurred in May 2012 while this appeal was pending, rendered the appeal equitably moot. QS first raised this argument in a motion to dismiss filed before the parties submitted their briefs. At the time, a panel of this court denied the motion

"subject to reconsideration by the panel that decides the merits of the appeals."

Having now reviewed the parties' briefs, we decline to decide the mootness issue and instead proceed directly to the merits. Were the receiver and QS' argument one of Article III mootness, we would of course be obligated to resolve it. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 101-02 (1998). When confronted with non-constitutional challenges to jurisdiction, however, "we are not so constrained." Aponte-Rosario v. Acevedo-Vilá, 617 F.3d 1, 6 (1st Cir. 2010). As explained below, this case readily can be resolved in favor of the receiver and QS, and when a party "easily wins an affirmance on the substantive issue," we may "decline to decide the jurisdictional issues raised by it." Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 59 (1st Cir. 2003) (quoting Menorah Ins. Co. v. INX Reinsurance Corp., 72 F.3d 218, 223 n.9 (1st Cir. 1995)) (internal quotation mark omitted).

Given the ease with which we may dispose of the merits, we also decline to take up the receiver and QS' secondary argument that Gangi has waived the sole argument he makes on appeal. Instead, we assume arguendo that he has not. See United States v. Brown, 295 F.3d 152, 155 n.4 (1st Cir. 2002) (bypassing complex waiver analysis in favor of a merits decision).

Proceeding then to the merits, we review the "well-established principles of equity" that govern issuance of a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). A court may, in its discretion, issue such an injunction if it concludes "(1) that [a party] has suffered" -- or, as here, will suffer -- "an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id.; see also Esso Standard Oil Co. v. López-Freytes, 522 F.3d 136, 148 (1st Cir. 2008).

The current situation amply warranted issuance of the injunction. The first two factors together require "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996)) (internal quotation marks omitted). The district court of course had no way of knowing precisely how Gangi might interfere with the receiver's ability to transfer BroadVoice and Convergent to QS or how Gangi might damage the value of BroadVoice, Convergent, or their assets. The court nonetheless had every reason to fear that he might inflict injuries that were difficult to detect, let alone measure.

-8-

Over the past decade, Gangi repeatedly has employed nefarious tactics to avoid meeting his responsibilities to others. See, e.g., GNAPS V, 603 F.3d at 93 (summarizing evidence that GNAPs lied to the district court and destroyed evidence); see also S. New Eng. Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 147-48 (2d Cir. 2010) (same). He has shown an apparent propensity for using technology to cover his tracks. See, e.g., GNAPS V, 603 F.3d at 94 (describing evidence that employee under Gangi's control digitally "shred[ded]" electronic accounting files). The district court quite rightly feared more of the same. We previously have affirmed a finding of substantial and inadequately compensable injury when a telecommunications company faced technological attacks on its ability to collect subscriber revenue. CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008). The injury contemplated here was similar and thus easily satisfied the first two factors.

Indeed, although we do not affirm the district court's injunction based on events that occurred after its issuance, subsequent events show that the court's fears about the sort of harm Gangi might inflict may well have been justified. Specifically, after the court imposed the injunction, the receiver had to seek an emergency temporary restraining order when a BroadVoice employee's computer was involved in an electronic attack on the BroadVoice system that allowed outsiders to make thousands of fraudulent calls to Africa and Europe, allegedly costing the

receivership estate $10,000 per day. Whether the employee intentionally helped outsiders attack BroadVoice to hinder the sale to QS or unwittingly served as a conduit for the attack was unclear. Given Gangi's history, the incident is at least suspicious.

Proceeding to the third factor, the balance of hardships between Gangi and the receivership estate quite obviously tilts in favor of the estate; Gangi can claim no legitimate interest in interfering with the transfer of BroadVoice and Convergent to QS or in damaging their value. Cf. R.I. Hosp. Trust Nat'l Bank v. Howard Commc'ns Corp., 980 F.2d 823, 829 (1st Cir. 1992) (interference with transfer of assets to receiver constituted "contumacious conduct" and warranted sanctions).

Gangi attempts to spin the third factor in his favor by arguing that the injunction actually constitutes a prohibition on competition that bars him from re-entering the VoIP business. He maintains that under Massachusetts law, a court may not impose such a restriction in conjunction with a forced judicial sale, and further contends that such a restriction is impermissible as matter of the Commonwealth's employment law. We need not address either argument, however, because we are not persuaded that the injunction prohibits competition at all. While the injunction does bar "contact or solicitation of any sort," there is no cause for reading those words as broadly as Gangi does.

-10-

Here, the injunction prohibits contact and solicitation that "interfer[es] with, . . . reduce[s] the value of, or otherwise damage[s]" BroadVoice and Convergent. Stretching "interfering with" or "damaging" to mean luring away customers with better services or rates is unwarranted. Accordingly, under the best reading, the injunction does not prohibit Gangi from starting a new VoIP provider that simply competes with BroadVoice on the open market. Rather, it prohibits him from misappropriating the BroadVoice customer list or other property, recruiting BroadVoice customers through deceit, or engaging in other wrongful conduct. See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 405-06 (2d Cir. 2004) (affirming a permanent injunction that barred a company from acquiring customers by deceiving them into thinking it was related to another company with which they already did business). If Gangi has concerns about the sorts of contact and solicitation permissible under the injunction, he of course is free to seek clarification from the district court based on specific facts. Regal Knitwear Co. v. NLRB, 324 U.S. 9, 15 (1945).

Turning at last to the fourth and final factor, the injunction plainly serves the public interest, which undoubtedly includes seeing that losing parties respect the judgments entered against them and that debtors pay their creditors. See, e.g., NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 263 (2d Cir. 2012) (finding that in light of debtor's "disregard of its legal

obligations" to creditors, public interest favored permanent injunction requiring specific performance of those obligations). Here, GNAPs, Gangi, and various Gangi alter egos together owe Verizon more than $57 million. The district court determined that accepting QS' bid and its associated terms and conditions, which include imposing the injunction, constitutes a "sound business judgment" and thus is the best way of ensuring that Gangi at last begins to pay what he owes.

Gangi again attempts to turn in his favor a factor that cuts against him by misconstruing the breadth of the injunction. He maintains that the district court has enjoined everyone outside of QS from contacting or soliciting BroadVoice customers. Obviously such a restriction would violate the public interest, see CVD, Inc. v. Raytheon Co., 769 F.2d 842, 849 (1st Cir. 1985) (noting "public interest in free competition"), not to mention the provision of the Federal Rules of Civil Procedure governing injunctions, Fed. R. Civ. P. 65(d)(2) (an injunction may only bind the parties, their representatives, and "other persons who are in active concert or participation with" them).

Gangi argues that his reading follows inescapably from the plain language of the injunction, which by its terms applies to "All Persons, including the Judgment Debtors and the Judgment Debtors' Agents, and Frank Gangi and any person operating under Frank Gangi's direction or control" (emphasis added).

-12-

Gangi's interpretation holds up, however, only if one does not read the rest of the order imposing the injunction. Just a few paragraphs before the passage Gangi quotes, the district court defined "Persons" as, inter alia, those "holding Claims arising under or out of, in connection with, or in any way relating to, the Judgment Debtors." Thus the court properly enjoined only Gangi's creditors, Gangi, and those working in concert with him, as contemplated by the Federal Rules. See Fed. R. Civ. P. 65.

In short, the injunction plainly was justified under longstanding equity principles, and Gangi's various other arguments against its imposition do not merit serious discussion. His protest that the district court did not support the injunction with adequate findings is without merit. The findings here, though brief, satisfied "the common sense rule that a court should let the parties and an appellate court know why it acts, and on what factual basis." Ben David v. Travisono, 495 F.2d 562, 563 (1st Cir. 1974). The district judge who issued the injunction has been managing this case for ten years, and although the supplemental order imposing the injunction did not go into great detail, other closely related orders were more thorough. These orders included the original order authorizing the auction and the sale order approving QS' bid, both of which specifically contemplated imposing the injunction. In such a situation, the brevity of the actual injunction order itself is perfectly acceptable. See CoxCom, Inc.,

-13-

536 F.3d at 112 ("The district court's earlier findings in support of the . . . preliminary injunction, combined with [the plaintiff's] success on the merits, supports the permanent injunction.").

Gangi's argument that the injunction is vague fails as well. Again, as noted above, if he is uncertain as to what is permissible under the injunction, he is free to seek clarification from the district court. Regal Knitwear Co., 324 U.S. at 15. "The mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." United States v. Greyhound Corp., 508 F.2d 529, 537 (7th Cir. 1974); accord United States v. Brown, 561 F.3d 420, 438 (5th Cir. 2009).

Finally, we decline to consider Gangi's assertion that the injunction "infringes on non-commercial and commercial speech protected by the First Amendment." Although he invokes Sorrell v. IMS Health Inc., 131 S. Ct. 2653 (2011), for the proposition that restrictions on commercial speech are constitutionally suspect, he does not advance any substantive argument. The "settled appellate rule" is "that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990); accord Igartúa v. United

-14-

States, 626 F.3d 592, 603 (1st Cir. 2010), cert. denied, 132 S. Ct. 2376 (2012); 132 S. Ct. 2375 (2012).

    Affirmed.