# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

|  |  |
|---|---|
| **GLOBAL NAPS, INC.,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**VERIZON NEW ENGLAND INC.,**<br><br>    **Defendant.** | **CIVIL ACTION NO. 02-12489-RWZ**<br>**CIVIL ACTION NO. 05-10079-RWZ** |

**MEMORANDUM IN SUPPORT OF THE MOTION OF THE UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY (I) TO COMPEL RECEIVER TO PROVIDE
ACCOUNTING, (II) TO COMPEL RECEIVER'S PROFESSIONALS TO SUBMIT
FEE APPLICATIONS, (III) TO PROHIBIT RECEIVER FROM FURTHER
DEPLETING RECEIVERSHIP ASSETS, AND (IV) TO REQUIRE THE RECEIVER
AND/OR VERIZON TO PAY POST-RECEIVERSHIP CLAIM**

The Universal Service Administrative Company ("USAC"), a party-in-interest as a

creditor of Global NAPs, Inc. ("Global NAPs") and one of its subsidiaries, Broadvoice, Inc.

("Broadvoice"; together with Global NAPs, the "Global NAPs Entities"), hereby submits this

Memorandum in Support of its Motion (I) to Compel Receiver to Provide Accounting, (II) to

Compel Receiver's Professionals to Submit Fee Applications, (III) to Prohibit Receiver from

Further Depleting Receivership Assets, and (IV) for Allowance of Post-Receivership Claim and

to Require the Receiver and/or Verizon to Pay Post-Receivership Claim (the "Motion").

More than three years ago, Carl F. Jenkins (the "Receiver") was appointed as receiver of

Global NAPs and its affiliates, subsidiaries, and other related entities (the "Receivership

Entities"). As receiver, the Receiver was required to operate the Receivership Entities'

businesses, identify and preserve their assets, and distribute Receivership property pursuant to

further court order. The Receivership was created at the request of Verizon New England Inc.

("Verizon"), which was the holder of a $57 million judgment against the Receivership Entities. During the three years since the inception of the Receivership, the Receiver withheld or delayed payment to certain creditors, including USAC, whose claims arose <u>during</u> his operation of the Receivership estate. As a result, there is now a massive disparity between the administrative costs of the Receivership and the funds remaining to pay those costs. USAC and other similarly-situated post-Receivership creditors have essentially funded the Receivership on an involuntary basis. Further, the Receiver has failed to provide meaningful financial information regarding the financial status of the Receivership estate including the assets liquidated, expenses of liquidation, and all disbursements from estate assets. The Receiver only recently disclosed that there are insufficient estate assets remaining to pay valid expenses that accrued during the Receivership.

USAC requests that this Court (i) compel the Receiver and his professionals to provide certain information, such as a complete accounting of assets liquidated and expenses paid, including the submission of detailed fee applications by the Receiver and his professionals, (ii) prohibit the Receiver from making any further distributions of Receivership assets absent notice to creditors, an objection period, and entry of a court order approving same, and (iii) order payment of USAC's post-Receivership claim by the Receiver and/or Verizon, if Receivership funds are insufficient.

## I. RECEIVER'S POST-RECEIVERSHIP OBLIGATIONS TO THE USF.

1. USAC has filed contemporaneously herewith its (I) Objection and Response to Receiver's, Carl F. Jenkins, Recommendation on Claims and (II) Request for Full Allowance of Post-Receivership Claim (the "USAC Response") and Memorandum in Support thereof which, *inter alia*, describe in detail the nature of and legal basis for USAC's post-Receivership claims. In the USAC Response and in the corresponding Memorandum in Support, USAC establishes its

2

post-Receivership Claim against Broadvoice in the amount of $765,173.44 as of June 14, 2013,

consisting of (a) claims against Broadvoice in the amount of $701,166.49 from the Receiver's

appointment on May 6, 2010 through May 2, 2012, when operations ceased, plus (b) additional

interest and penalties, totaling $64,006.95 as of June 14, 2013, which continue to accrue until all

obligations are paid.

## II.    THE RECEIVER MUST ACCOUNT FOR HIS WORK AS RECEIVER.

### A.    Appointment of Receiver.

2.    On May 6, 2010, this Court appointed Carl F. Jenkins (i.e., the Receiver) as the

receiver of the Receivership Entities [Dkt. No. 617]. On May 13, 2010, the Court amended its

original order establishing the receivership (the "Receivership") and appointing the Receiver.

See Amended Order for Appointment of Keeper and Receiver (the "Receivership Order") [Dkt.

No. 624].

3.    Early in the Receivership proceedings, USAC alerted the Receiver to the

mandatory obligations of the Global NAPS Entities to the USF. In August of 2010, USAC sent a

letter to the Receiver, through counsel, which detailed the Global NAPS Entities' ongoing

obligations and included all statutory references required for the Receiver to independently

verify the obligations.[1]

4.    Throughout the Receivership, USAC attempted to engage the Receiver in

substantive discussions regarding the failure of the Global NAPS Entities to comply with their

USF Obligations. The Receiver consistently failed to address the USF Obligations. As a result,

USAC raised its concerns before this Court on multiple occasions. See Dkt. Nos. 725, 726, 727,

746, 766, 804 and 852.

---

[1]    A copy of this letter is attached as Exhibit 1 to the Affidavit of Michelle Garber (the "Garber Aff.") filed herewith.

## C.    The Receiver Must Provide an Accounting.

5.    On June 7, 2011, USAC filed its Motion for Entry of an Order Requiring Receiver to (I) Comply with Payment and Reporting Obligations Related to the Universal Service Fund and (II) Provide Meaningful Periodic Financial Information to Creditors Regarding Receivership Status (the "Compliance Motion") [Dkt. No. 725].

6.    In the Compliance Motion, USAC specifically requested that the Receiver provide USAC and other interested creditors with the following information on a monthly basis:

     a.    Itemized statements showing receipts and disbursements;

     b.    Rolling 13-week cash flow projections, updated with variances; and

     c.    Statements of profit and loss ("Detailed Monthly Financial Reports").

Compliance Motion, ¶ 5 [Dkt. No. 725].

7.    After a hearing in March 2012, this Court entered an Electronic Order on March 14, 2012, which was subsequently amended on April 4, 2012, granting the Compliance Motion. By virtue of the Court granting the Compliance Motion, the Receiver has, arguably, been under order of the Court to provide Detailed Monthly Financial Reports to permit USAC and other creditors to assess the Receiver's progress and monitor payments made by the Receiver since March of 2012.

8.    The reporting obligations requested by USAC in the Compliance Motion are identical to those required of trustees in bankruptcy proceedings.[2]  A common theme throughout this Receivership is the Receiver's attempt to take advantage of the tenets of a Chapter 11

---

[2]    In all Chapter 11 bankruptcy proceedings in the District of Massachusetts (i.e. proceedings where the debtor's operations are ongoing for at least a period of time), monthly operating reports nearly identical to the information requested in the Compliance Motion, must be submitted to the U.S. Trustee's Office and, often, provided to interested parties.  Bankruptcy courts require this level of detail so the court and interested parties may adequately monitor the activities of either debtor's management or an appointed trustee, both of which are fiduciaries to the creditors.  The Receiver, a fiduciary to the creditors of the Receivership Estates, must be held to the same minimum standards.

bankruptcy, without being responsible for the attendant burdens. By no means can the Receiver argue that preparation and submission of the information required in the Detailed Monthly Financial Reports is overly burdensome, as it is routinely required of similarly-situated fiduciaries.

9.      Similarly, the Massachusetts receivership statute (incorporated in this situation pursuant to Fed. R. Civ. P. 64, 66, and 69(a)) requires the Receiver to provide an annual accounting, including a report of the "condition of the receivership." See Mass. R. Civ. P. 66(c). ("Every receiver shall file, not later than the fifteenth day of February of each year, a detailed account under oath of his receivership to and including the last day of the preceding year . . . together with a report of the condition of the receivership."). Accordingly, the filing of an annual accounting is the bare minimum of disclosure required of an estate fiduciary such as the Receiver. This Court's docket reflects no such filing.[3]

10.      The Receiver has failed to file any such annual accounting, as required by the Massachusetts receivership statute, which all creditors can view. Moreover, to date USAC has received only three spreadsheets from the Receiver, each titled "Schedule of Cash Receipts and Disbursements," for differing periods. The first covered the month of May 2010, the second covered May 2010 through September 2010, and the third, consisting of just three pages, covered May 2010 through April 2012. Copies of the three Schedules of Cash Receipts and Disbursements are attached hereto as **Exhibits A–C**. These spreadsheets represent the only financial information provided by the Receiver to USAC. None of the spreadsheets contained

---

[3]      In the Receiver's recently-filed Opposition to Frank Gangi's motion for an accounting [Dkt. No. 1002], the Receiver points to the Receivership Order as evidence that the Court relieved the Receiver from his statutory reporting requirements, as the Court may do pursuant to Mass. R. Civ. P. 66(f). Absent any indication within the Receivership Order that the Court intended to relieve the Receiver from his statutory reporting obligations, however, it is just as plausible that the Receivership Order directs "further accounts and reports" in addition to the statutorily required reports, as contemplated by Mass. R. Civ. P. 66(c) ("[A receiver] shall also file such further and accounts as the court may order.").

the level of detail required to satisfy the Receiver's obligation to provide Detailed Monthly Financial Reports.

11.     The spreadsheets supplied by the Receiver fail to provide the meaningful financial information that USAC requested in the Compliance Motion and fail to meet the requirements of Mass. R. Civ. P. 66(c).  Further, they are insufficient to evaluate the Receiver's activities to date.  Among other things, the Schedules of Cash Receipts and Disbursements provide no information regarding the value of assets liquidated to date and remaining cash on hand.  The spreadsheets provided by the Receiver merely list receipts and disbursements from certain business activities without providing a breakdown or explanation beyond top line financial data for various categories.  It is impossible to tell which creditors the Receiver paid, when the obligations arose that the Receiver selected for payment (i.e., whether pre- or post-Receivership), or the percentage of the creditors' claims that the Receiver has satisfied.  The Receiver lists only categories and has provided no specific data or underlying detail.  Further, the Receiver fails to state a current cash position inclusive of all bank accounts under the Receiver's control.

12.     Most shocking are two additions to the most recent spreadsheet provided in September of 2012, after operations fully ceased.  First, that spreadsheet contains evidence of the depletion of additional Receivership accounts that are not disclosed on any reports provided to USAC.  Specifically, the September 2012 spreadsheet contained new line item "Transfer in for Administrative Costs."  That line item shows "transfers in" beginning in March 2011 and amounting to more than $5.3 million through April 2012.  After USAC questioned the Receiver about this line item, he disclosed that he controls accounts for the Receivership estate that were not identified on the Schedule of Cash Receipts and Disbursements provided in September, and were not even referenced on the prior two.  The Receiver has not identified or quantified the

6

multiple accounts, nor has he itemized the funds transferred into and out of those accounts. Significantly, the Receiver has not disclosed whether such previously-undisclosed accounts have been fully or substantially depleted. Transparency is absolutely mandatory to enable a proper evaluation of the Receiver's actions and avoid undue prejudice to creditors. The spreadsheets exemplify the Receiver's failure to account to those to whom he owes fiduciary duties and, further, highlight the overall lack of transparency throughout this Receivership.

13.    Second, it appears the Receiver has paid substantial Receivership Expenses from Receivership Property without providing creditors an opportunity to review and voice objection to payment of those expenses, if necessary.

14.    For example, according to the spreadsheets, the Receiver paid nearly $8 million for the "Legal/Consultant" expenses, which appear to include receivership related expenses, from May 2010-April 2012. There is no motion on the docket requesting authority to make payments of this magnitude outside the scope of the Receivership Order, and there is no order of any kind authorizing these payments. <u>Hilti, Inc. v. HML Development Corp.</u>, 2007 WL 809792 at *16 (Mass. Super. February 13, 2007) ("a Receiver owes fiduciary duty to all of the parties in interest, including creditors and the shareholder(s), and is 'under the duty to act impartially toward, and protect the rights of, all parties'") (citations omitted).

15.    The spreadsheets appear to indicate that the Receiver may have paid his fees from assets of the Receivership Property. This is inappropriate. The Receivership Order clearly states that the Receiver's expenses and compensation are to be paid by Verizon and SNET. Receivership Order ¶ 13. The docket reflects no request by the Receiver to modify the Receivership Order.

16.     USAC demands that the Receiver be ordered to submit a comprehensive and detailed accounting, including a current balance sheet which accounts for all Receivership property, an itemized statement of receipts and disbursements, a balance sheet, a statement of profit and loss, and/or other relevant financial documents as directed in the Compliance Motion granted by this Court and as required by the Massachusetts receivership statute, in order to evaluate the management of Receivership Property.

**B.      The Receiver and His Professionals Should Submit Detailed Requests for Allowance and Approval of Their Fees and Expenses.**

17.     The Receivership Order, which was entered on May 6, 2010 and amended on May 13, 2010, directs the Receiver to collect and administer the assets of the Receivership and "make payments solely for ordinary course business expenses." See Receivership Order ¶¶ 1-5. The Receiver is allowed to engage an accountant and other professionals, and attorneys, upon approval by the Court. Receivership Order ¶¶ 7, 9.

18.     The Receivership Order contemplates that the Receiver and his professionals may receive reasonable compensation. Receivership Order ¶¶ 9, 13. For the Receiver's compensation, he may "[a]t such intervals as the Receiver deems appropriate . . . submit the Receiver's expenses to the parties for payment, including the Receiver's compensation, such expenses to be borne as follows: 90 percent by Verizon, and 10 percent by SNET." Receivership Order ¶ 13 (emphasis added). The Receiver is authorized to make payments solely for ordinary course business expenses actually and reasonably incurred, but must submit Receivership expenses to Verizon and SNET for payment. Receivership Order ¶¶ 5, 13. The Receiver cannot simply pay himself from the Receivership Property. Yet, it appears that this may have occurred.

19.     The spreadsheets produced on September 13, 2012, only after operations had ceased, disclosed to USAC for the first time that "receivership related costs" were being paid

8

from Receivership Property as "Legal/Consultants" expenses. Prior to this disclosure, the spreadsheets contained a line item for "Legal/Consultants" expenses, but no mention was made that those expenses included the administrative costs of the Receivership.

20.    The first two spreadsheets provided did not disclose that Receivership-related expenses were being paid from Receivership Property. (See Exhibits A and B.) However, the third spreadsheet provided defines "Legal/Consultants to include "receivership related costs." (See Exhibit C.) No further explanation or detail is provided. Payment of the Receiver's fees, including his professionals' fees, from assets of the Receivership Property is inappropriate. As previously noted, the Receivership Order clearly states that the Receiver's expenses and compensation are to be paid by Verizon and SNET, and the docket reflects no request by the Receiver to modify the Receivership Order.

21.    To the extent that the Receiver has paid professionals' expenses from the Receivership estate rather than submitting those expenses to Verizon and SNET, in contravention of the Receivership Order, those professionals should be required to submit detailed applications for allowance of their fees. This is a requirement of estate professionals in bankruptcy cases and, in light of the recently disclosed significant shortfall here, it should be required in this situation as well. A copy of the Massachusetts local bankruptcy rule addressing fee applications is attached hereto as **Exhibit D**. Further, as discussed below, Verizon and SNET must reimburse the Receivership for those reasonable expenses as required by the Receivership Order.

22.    Finally, on August 1, 2012, the Receiver entered into a Settlement Agreement with various Verizon entities to resolve litigation between those Verizon entities and various Global NAPS entities pending in the United States District Court for the Eastern District of New

York at Docket No. 07-cv-4459 (ENV) (RML).[4] As a result of the Settlement Agreement, Verizon agreed to reduce its judgment in *this* proceeding by $21.5 million, leaving an outstanding judgment of $36,216,714 (plus post-judgment interest) after reduction. Settlement Agreement ¶ 2. With only $3 million in the Receivership estate, however, this Settlement Agreement confers no benefit whatsoever on the Receivership—the Receiver is no more able to pay a $36 million judgment than he is a $57 million judgment. Where it becomes reasonably obvious that litigation will cost more than it likely will benefit the estate, counsel has a duty to abandon that litigation. See e.g., In re Wolverine, Proctor & Schwartz, LLC, No. 06-10815-JNF, 2012 WL 3930360 (Bankr. D. Mass. Sept. 10, 2012) (analyzing and reducing bankruptcy trustee's professionals' fees due to unsuccessful litigation). To the extent that the Receiver and his professionals expended excessive resources to bring the New York litigation to a settlement that has no value for the Receivership, the fees asserted by the Receiver and his professionals should be subject to significant scrutiny by this Court after full disclosure and input by creditors.

  C.  __The Receiver Should be Prohibited from Making Further Distributions.__

  23.  Given the lack of meaningful reporting and disclosure by the Receiver and the objectionable administration of the Receivership estate to date, further disbursements from the Receivership estate should be specifically prohibited. To the extent that the Receiver proposes disbursements, the Receiver should be required to publically seek this Court's approval, and provide interested parties the opportunity to respond.

---

[4] A copy of the Settlement Agreement was filed with this Court on August 10, 2012 at Dkt. No. 889-1.

## III. THE RECEIVER AND/OR VERIZON AND SNET MUST PAY USAC'S POST-RECEIVERSHIP CLAIM.

### A. The Receiver Is Responsible For Ensuring Payment of USF Obligations.

24.     There is no doubt that the Receiver, as a court-appointed receiver, is a "full fledged fiduciary." Fleet Nat. Bank v. H&D Entertainment, Inc., 96 F.3d 532, 540 (1st Cir. 1996). A receiver does not act solely as the agent of the company for which he or she has been appointed receiver. Rochester Tumbler Works v. Mitchell Woodbury Co., 215 Mass. 194, 198 (1913). Indeed, a receiver is a representative of the court and also of all parties with an interest in the litigation. Wellman v. North, 256 Mass. 496, 501 (1926). Thus, a receiver owes a fiduciary duty to all the parties in interest, including the creditors, and is "under the duty to act impartially toward, and protect the rights of, all parties." Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946) (Receiver owes a duty of strict impartiality and undivided loyalty to all parties interested in the receivership estate, and must not dilute that loyalty.)

25.     The objective of the receiver should be that of estate maximization. Fleet Nat. Bank, 96 F.3d at 540. The objective of estate maximization is also secured in part by the "safeguard of estate oversight" of any actions taken by a receiver. Id. Under the Massachusetts receivership statute, the receiver has a duty to pay all debts due from the corporation if the funds in his hands are sufficient and, if they are not, to distribute the funds ratably among the court-approved creditors. See G.L. c. 156B § 106. It is the duty of the receiver to determine the validity and the preference to be accorded to the claims of creditors. Old Colony Trust Co. v. Puritan Motors Corp., 244 Mass. 259, 261 (1923). It is of paramount importance during this process that the receiver ensures that the creditors receive equality of treatment so far as is permissible under the law. New England Theaters v. Olympia Theaters, 287 Mass. 485, 494 (1934).

26.     USAC informed the Receiver of the past-due and on-going USF Obligations of the Global NAPS Entities in the August 10 Letter.  USAC then continued to invoice new USF obligations to the Global NAPS Entities on a monthly basis throughout the Receivership.  USAC has also sent periodic requests to Receiver's counsel requesting, among other things, current financial information regarding the Global NAPS Entities and information regarding the Receiver's intent to address USF issues.  Despite USAC's efforts, the Receiver has failed to timely pay the USF obligations and, remarkably, the Receiver has allowed the unpaid USF Obligations to significantly increase during the Receivership.  At a minimum, the Receiver must address and be held responsible for the USF Obligations that have accrued since his appointment.  Payment of these obligations fall squarely within the Receiver's duties.  See Receivership Order, ¶¶ 1 and 5.

### B.     The Receiver Must Pay USAC's Post-Receivership Claim Per Sale Order.

27.     The Receiver obtained Court approval for a sale of certain Receivership Property to Quality Speaks, LLC.  Prior to the sale closing on May 2, 2012, the Receiver negotiated certain provisions of the proposed sale order with various creditors that had objected to certain sale provisions, including USAC.  After negotiating a consensual resolution with each objecting creditor, the Receiver requested approval for the sale from this Court.  On February 14, 2012, this Court entered a Supplemental Order to This Court's December 16, 2011 Order Authorizing the Sale of Certain Receivership Assets Free and Clear of All Liens, Claims, Interests and Encumbrances to Quality Speaks, LLC ("Supplemental Sale Order") [Dkt. No. 827].  The Supplemental Sale Order requires that, "[t]he Receiver shall be responsible for and shall pay any and all obligations to the Universal Service Fund (the "USF") that arise hereunder [. . .] *prior to* the Closing Date."  See Supplemental Sale Order, ¶ 12.  (emphasis added.)

12

28.     The Supplemental Sale Order also requires that until such time as the USF

Obligations are resolved and paid, the Receiver shall retain sufficient funds on hand *and*

*available to pay* the USF Obligations in the full amount asserted by USAC. See Supplemental

Sale Order, ¶ 17. (emphasis added.) The Supplemental Sale Order even specifically notes that

the amount of these USF Obligations totaled approximately $450,000.00 as of January 13, 2012.

Id.

29.     Not only is this language included as part of this Court's Order, the terms were

negotiated and agreed to by the Receiver, and included as part of the proposed sale order that the

Receiver submitted to the Court for approval.  USAC negotiated the terms of the Supplemental

Sale Order in good faith to resolve its substantive objections to certain provisions of the

Receiver's sale.  USAC reasonably relied on the terms and provisions that it negotiated and the

assurances contained in the Supplemental Sale Order.  The Receiver was well aware of his

responsibility to pay the outstanding USF Obligations at the time of sale or, at a minimum, to set

aside sufficient funds to pay the obligations in the full amount asserted by USAC.

30.     Despite the closing of the sale on May 2, 2012, the Receiver has not paid the

outstanding post-receivership USF Obligations, nor provided any assurances that sufficient funds

have been set aside to pay the USF Obligations in the full amount asserted by USAC.

31.     USAC demands that the Receiver make immediate payment of  at least

$765,173.44, the outstanding post-receivership USF Obligations as of the date hereof.  At

minimum, the Receiver must deliver the $450,000 that he was directed to set aside pursuant to

the Supplemental Sale Order.

**C. Verizon Should Pay USAC's Post-Receivership Claim If Receivership Assets Are Insufficient.**

32. To the extent that the Receiver has caused the dissipation of funds from the Receivership estate such that he is unable to pay USAC's administrative claims in full, this Court should require Verizon to pay such claims instead. At minimum, Verizon should be prohibited from participating in any distribution from the Receivership Estate.

**i. Verizon Should Pay USAC's Post-Receivership Claim.**

33. At the commencement of the Receivership, Verizon had a $57 million judgment. The Receivership was commenced at the behest of Verizon. Upon information and belief, Verizon prepared the Receivership Order and, as such, consented to its terms and conditions. Indeed, the Receivership Order confers a benefit on Verizon and SNET, with distributions of Receivership Property ultimately intended to be distributed 90% to Verizon and 10% to SNET. Receivership Order ¶ 16.

34. The Receivership Order requires the Receiver to provide an accounting of ordinary course business expenses "to the Court, Judgment Debtors, Verizon, and SNET." Receivership Order at ¶ 5. As previously discussed, creditors such as USAC have received, to date, only meager and non-specific "accountings" that fail to adequately inform creditors of the assets and liabilities of the Receivership. The Receivership Order clearly provides Verizon with access to a more detailed financial picture of the Global NAPS Entities' estates throughout the three-year Receivership. Receivership Order at ¶ 5.

35. As the creditor with sole access to detailed financial accountings and for whose benefit the Receivership was established, Verizon had a duty to monitor and track the Receivership. It was in a unique position to inform this Court and other creditors of the

14

Receivership's growing insolvency. However, Verizon remained silent on these issues.[5]

Further, instead of disclosing its unique knowledge, Verizon purportedly incurred a significant

portion of its $450 million claim post-Receivership without publicizing the full extent of that

claim until recently, in connection with the Receiver's claims process. According to the

Receiver's, Carl F. Jenkins, Recommendations on Claims (the "Recommendation") filed June

24, 2013 [Dkt. No. 991], Verizon asserted a pre-Receivership claim of $320 million and a post-

Receivership claim of $129 million. As the Receivership has been in place for more than 36

months, that amounts to an accrual rate of approximately over *$3.5 million per month*.[6] Notably,

Verizon failed to disclose that the first "accounting" provided to it by the Receiver failed to

account for its purported post-Receivership claim. With claims accruing at such a steep rate,

Verizon should have informed this Court of its position within the first month or two of the

Receivership, rather than waiting to assert its claim in connection with the Receiver's late-stage

claims process.

36.     Even if Verizon was unaware of the scope of its potential post-Receivership

claims within the first few months of the Receivership, it certainly should have disclosed its

claims as of, at minimum, the March 14, 2012 hearing, during which USAC expressed great

concern about the possibility of administrative insolvency. At least publicly, Verizon remained

silent regarding the magnitude of its purported post-Receivership claim. Verizon permitted this

Receivership to drag on, to the detriment of USAC and other creditors, without even disclosing

its steep $3.5 million per month accrual rate for the benefit of this Court and other impacted

---

[5]     Indeed, in the Receiver's recently-filed Opposition to Frank Gangi's request for an accounting, the Receiver
discloses that he provided the Court, Judgment Debtors, Verizon, and SNET with accounting information on
seven (7) different occasions throughout the Receivership. He also claims to be unaware of any complaints
regarding that accounting information, making it likely that Verizon remained silent in private as well as in
Court.

[6]     Due to the lack of transparency by the Receiver, it is unknown to USAC whether the Receiver made post-
Receivership payments to Verizon, or in what amount.

creditors.[7] In this situation, where the Receivership was commenced at Verizon's request, for Verizon's own benefit and protection, and where Verizon never sought termination of the Receivership despite its knowledge that Receivership expenses would be disproportionate to the ultimate value conferred on creditors, Verizon should be required to pay the costs of the Receivership. See Bowersock Mills & Power Co. v. Joyce, 101 F.2d 1000, 1004 (8th Cir. 1939) (finding that the plaintiff should be held liable for the costs of the receivership "because the Court . . . did exactly what the [plaintiff] asked it to do, and did it for the sole benefit of the [plaintiff] and to protect its business and good will, and because the [plaintiff] had as much knowledge as anyone about the value of [the] . . . products which the receiver was to collect and dispose of").

### ii. The Receivership Order Requires Verizon to Pay the Receiver's Expenses.

37.     Further, the Receivership Order on its face requires the Receiver to submit his expenses to certain parties, including Verizon, for payment, with expenses to be borne as follows: "90 percent by Verizon and 10% by SNET." Receivership Order, ¶ 13. USAC relied on the clear terms of the Receivership Order, and understood Verizon and SNET would bear the expenses of the Receivership, rather than involuntary creditors. It appears, however, that the Receiver paid his own expenses (including professionals' fees) from the Receivership estate, rather than requiring Verizon to pay those expenses. At a minimum, Verizon (and SNET, to the extent applicable) must satisfy the Receivership expenses as required by the Receivership Order.

---

[7]     More information is needed regarding the Verizon claim. As previously discussed, the Settlement Agreement regarding the New York litigation reduced Verizon's judgment by $21.5 million. However, it is unclear whether any of the settlement should have been used to reduce Verizon's post-Receivership claim rather than its pre-Receivership judgment. It is apparent that a detailed accounting of Verizon's claim is also necessary to prevent unfairness to other post-Receivership creditors.

Moreover, Verizon should now be required to pay for the post-Receivership claims of USAC and other similarly situated post-Receivership creditors.

### iii. At minimum, Verizon Should be Prohibited from Participating in Distribution from Receivership Estate.

38.     At minimum, this Court should prohibit Verizon from participating in any distribution from the $3 million in assets that the Receiver is currently holding.  It would be completely inequitable to allow Verizon—the one creditor with unique access to financial information of the Receivership—to benefit from any aspect of the Receivership without taking on the burdens that it was required to take on pursuant to the Receivership Order.

39.     The remedy of equitable subordination is appropriate, among other places, where "a third party dominates or controls the debtor to the disadvantage of others." Capital Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), 968 F.2d 1332, 1359-60 (1st Cir. 1992).  Here, where the Receivership was formed at the behest of Verizon, while Verizon was attempting to collect on a judgment.  Verizon permitted the Receivership to continue operations with the knowledge of its own massive and growing post-Receivership claim.  For more than three years, Verizon withheld its knowledge of the administratively insolvency of the Receivership Estate from the Court and from creditors such as USAC.  Subordination of Verizon's claim is therefore warranted.  See id.; see also In re Osborne, 42 B.R. 988, 999 (W.D. Wis. 1984) (subordinating claim because creditor misrepresented debtor's financial situation to another creditor so that the other creditor would continue to give the debtor credit).

### iv. It is Appropriate to Surcharge Receivership Assets for the Administrative Expenses of the Receivership.

40.     In the bankruptcy context, a trustee may recover from property securing an allowed secured claim the reasonable and necessary costs and expenses of preserving or

17

disposing of the secured creditor's collateral.  11 U.S.C. § 506(c); <u>Hartford Underwriters Ins. Co.</u> <u>v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 5 (2000).  If a secured creditor consents to the debtor's

continued operation, "it also impliedly consents to the debtor surcharging the necessary

operating expenses of continuing its business against the creditor's secured claim." <u>In re Mach.,</u>

<u>Inc.</u>, 287 B.R. 755, 768 (Bankr. E.D. Mo. 2002).  Here, where Verizon agreed to the

Receivership Order, which required expenses of the Receiver to be borne 90% by Verizon and

10% by SNET, and then stood by silently while the Receiver expended significant resources for

Verizon's sole benefit, it is appropriate to surcharge estate assets (which Verizon views as its

collateral) for the administrative expenses of the Receivership.

**IV.    CONCLUSION.**

41.    By accepting the appointment, the Receiver undertook significant responsibilities,

including fulfillment of the Global NAPS Entities' obligations to USAC.  USAC was a creditor

at the time of his appointment, and throughout the Receivership, USAC's claims have increased.

It is well established that the Receiver owes a fiduciary obligation to the creditors of the Global

NAPS Entities to protect and maximize the value of their assets.  <u>Fleet Nat'l Bank v. H & D</u>

<u>Entm't, Inc.</u>, 96 F.3d 532, 540 (1st Cir. 1996) (referring to a receiver as a "full-fledged fiduciary"

of the entity that the receiver represents); <u>Phelan v. Middle States Oil Corp.</u>, 154 F.2d 978, 991

(2nd Cir. 1946) (stating that a receiver has a "duty of strict impartiality, of 'undivided loyalty,' to

all persons interested in the receivership estate").  Notwithstanding his fiduciary obligation and

the specific terms of the Receivership Order, the Receiver caused dissipation of assets from the

Receivership estate without informing this Court or USAC of the scope of assets and liabilities

of the estate.  This pattern is consistent with the Receiver's attempt to take advantage of certain

tenets of a Chapter 11 bankruptcy, while ignoring the burdens.  These burdens include full

transparency through affirmative disclosures as well as equal treatment of similarly situated creditors. To prevent further inequity, this Court must require the Receiver to provide a transparent accounting of the state of the Receivership and prevent further distributions from the Receivership Estate. Further, the Receiver and/or Verizon must be required to pay post-Receivership claims of USAC and other creditors, in accordance with their duties under the Massachusetts receivership statute and the Receivership Order.

42.     In light of the foregoing, the Universal Service Administrative Company respectfully requests that this Court grant its Motion. USAC specifically requests that this Court enter an Order requiring the following:

      A.      Delivery to USAC and other creditors of an accounting, including any and all financial reporting, in connection with the Global NAPS Entities and the Receivership;

      B.      Prohibition against any further diminution of the Receivership Estate;

      C.      Submission of detailed fee applications from the Receiver and his professionals; and

      D.      Payment of all outstanding post-Receivership contributions owed to the USF by the Receiver or, if he is unable to do so, by Verizon; and

E.    At minimum, prohibition on Verizon's sharing of any assets from the

Receivership Estate.

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY

By its attorneys,

/s/ Gina Barbieri O'Neil
Joseph H. Baldiga, Esq. BBO #549963
Christine E. Devine, Esq. BBO #566990
Gina Barbieri O'Neil, Esq. BBO #
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:   (508) 791-8502

Dated: July 8, 2013

## CERTIFICATE OF SERVICE

I, Gina Barbieri O'Neil, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 8, 2013.

/s/ Gina Barbieri O'Neil
Gina Barbieri O'Neil, Esq.

{Practice Areas/CORP/18306/00070/A2316605.DOC[Ver:2]}

# EXHIBIT A

### Global Naps, Inc. v. Verizon New England Inc.
### Schedule of Cash Receipts and Disbursements
### May 1, 2010 Through May 31, 2010

| | May |
|---|---:|
| **Cash Receipts** | |
| Customer/Other Deposits | $ 887,455 |
| Subscriber Credit Card Deposits | 1,081,981 |
| Total Receipts | $ 1,969,436 |
| | |
| **Cash Disbursements** | |
| Aircraft | $ 117,810 |
| Employee Expenses/Travel/Meals | 3,472 |
| Fiber Optics | 60,311 |
| Industry Services | 490,251 |
| Insurance | 1,505 |
| Legal/Consultant | 231,311 |
| Mailings (including phones) | 9,685 |
| Maintenance | 33,730 |
| Marketing | 11,186 |
| Medical Insurance | 67,131 |
| Other | 3,635 |
| Payroll | 398,489 |
| Payroll (taxes, processing, benefits) | 115,087 |
| Rent | 120,912 |
| Taxes | - |
| Utilities | 59,417 |
| Vehicles | 10,261 |
| Total Disbursements | $ 1,734,193 |
| | |
| **Net Cash Flow** | $ 235,243 |
| | |
| **Total Bank Balances** | |
| Beginning Balance | $ 1,006,629 |
| Additional Depository Accounts | 241,983 |
| Ending Balance | $ 1,483,855 |

# EXHIBIT B

## Global NAPs, Inc. v. Verizon New England Inc.
### Schedule of Cash Receipts and Disbursements
### May 1, 2010 through September 30, 2010
### (Cash Basis of Accounting)

| | May | June | July | August | September |
|---|---|---|---|---|---|
| **Cash Receipts** | | | | | |
| Customer/Other Deposits | $ 887,455 | $ 1,071,249 | $ 1,011,396 | $ 917,989 | $ 961,007 |
| Subscriber Credit Card/Other Deposits | 1,081,981 | 1,172,101 | 1,169,172 | 1,139,363 | 1,154,533 |
| Total Receipts | $ 1,969,436 | $ 2,243,350 | $ 2,180,568 | $ 2,057,352 | $ 2,115,540 |
| | | | | | |
| **Cash Disbursements** | | | | | |
| Aircraft | $ 117,810 | $ 39,584 | $ 91,158 | $ 66,230 | $ 25,907 |
| Employee Expenses/Travel/Meals | 3,472 | 9,973 | 8,676 | 4,693 | 4,491 |
| Fiber Optics | 60,311 | 446,705 | 195,426 | 249,707 | 332,628 |
| Industry Services | 490,251 | 393,599 | 570,186 | 529,089 | 365,337 |
| Insurance | 1,505 | 24,949 | 4,137 | 746 | 741 |
| Legal/Consultants | 231,311 | 292,036 | 420,479 | 233,398 | 282,426 |
| Mailings/Phone Delivery | 9,685 | 10,495 | 4,441 | 7,474 | 118 |
| Maintenance | 33,730 | 20,907 | 11,553 | 22,042 | 31,725 |
| Marketing | 11,186 | 67,130 | 9,052 | 9,941 | 3,660 |
| Medical Insurance | 67,131 | 68,013 | 61,619 | 66,026 | 16,976 |
| Misc/Other | 3,635 | 13,045 | 6,934 | 4,631 | 6,674 |
| Payroll | 398,489 | 432,719 | 429,604 | 439,855 | 390,555 |
| Payroll (taxes, processing, benefits) | 115,087 | 338,516 | 215,146 | 211,555 | 196,035 |
| Rent | 120,912 | 158,837 | 189,776 | 139,611 | 150,318 |
| Taxes | - | 2,434 | 2,131 | 964 | - |
| Utilities | 59,417 | 124,783 | 26,157 | 37,092 | 26,682 |
| Vehicles | 10,261 | 10,194 | 7,807 | 6,203 | 5,814 |
| Total Disbursements | $ 1,734,193 | $ 2,453,919 | $ 2,254,282 | $ 2,029,257 | $ 1,840,087 |
| | | | | | |
| **Net Cash Flow** | $ 235,243 | $ (210,569) | $ (73,714) | $ 28,095 | $ 275,453 |
| | | | | | |
| **Bank Balances** | | | | | |
| Beginning Balance | $ 1,006,629 | $ 1,483,855 | $ 1,273,286 | $ 1,199,572 | $ 1,227,667 |
| Additional Depository Accounts | 241,983 | | | | |
| Ending Balance | $ 1,483,855 | $ 1,273,286 | $ 1,199,572 | $ 1,227,667 | $ 1,503,120 |

# EXHIBIT C

# Global NAPs, Inc. v. Verizon New England Inc.
## Schedule of Cash Receipts and Disbursements
### May 1, 2010 through January 31, 2011
#### (Cash Basis of Accounting)

| | 2010 | | | | | | | | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | August | September | October | November | December | January |
| **Cash Receipts** | | | | | | | | | |
| Customer/Other Deposits | $ 887,455 | $ 1,071,249 | $ 1,011,396 | $ 917,989 | $ 961,007 | $ 884,939 | $ 788,977 | $ 904,336 | $ 848,812 |
| Subscriber Credit Card/Other Deposits | 1,081,981 | 1,172,101 | 1,169,172 | 1,139,363 | 1,154,533 | 1,039,224 | 1,021,837 | 1,134,079 | 957,217 |
| Total Receipts | $ 1,969,436 | $ 2,243,350 | $ 2,180,568 | $ 2,057,352 | $ 2,115,540 | $ 1,924,163 | $ 1,810,814 | $ 2,038,405 | $ 1,806,029 |
| **Cash Disbursements** | | | | | | | | | |
| Aircraft | $ 117,810 | $ 39,584 | $ 91,158 | $ 66,230 | $ 25,907 | $ 47,443 | $ 85,827 | $ 67,752 | $ 57,886 |
| Employee Expenses/Travel/Meals | 3,472 | 9,973 | 8,676 | 4,491 | 4,155 | 4,135 | 9,143 | 4,334 | 2,100 |
| Fiber Optics | 60,311 | 446,705 | 195,426 | 249,707 | 332,628 | 490,578 | 311,534 | 251,438 | 231,775 |
| Industry Services | 490,251 | 393,399 | 570,186 | 529,089 | 365,337 | 280,761 | 610,240 | 385,211 | 573,180 |
| Insurance | 1,505 | 24,949 | 4,137 | 746 | 741 | 75,480 | 1,482 | | 388 |
| Legal/Consultants | 231,311 | 292,036 | 420,479 | 233,398 | 282,426 | 216,280 | 258,619 | 287,206 | 190,565 |
| Mailings/Phone Delivery | 9,685 | 10,495 | 4,441 | 7,474 | 118 | 11,519 | 4,892 | 4,022 | 4,529 |
| Maintenance | 33,730 | 20,907 | 11,553 | 22,042 | 31,725 | 15,606 | 5,774 | 4,703 | 12,244 |
| Marketing | 11,186 | 67,130 | 9,652 | 9,941 | 3,660 | 21,294 | 35,335 | 9,647 | |
| Medical Insurance | 67,131 | 68,013 | 61,619 | 66,026 | 16,976 | 114,728 | 72,776 | 76,205 | 68,276 |
| Misc/Other | 3,635 | 13,045 | 6,934 | 4,631 | 6,674 | 5,127 | 8,996 | 3,498 | 5,854 |
| Payroll | 398,489 | 432,719 | 429,604 | 439,855 | 390,555 | 435,124 | 421,875 | 442,354 | 415,253 |
| Payroll (taxes, processing, benefits) | 115,087 | 338,316 | 215,146 | 211,555 | 196,035 | 108,031 | 316,702 | 205,195 | 211,726 |
| Rent | 120,912 | 158,837 | 189,776 | 139,611 | 150,318 | 144,597 | 111,900 | 124,196 | 141,854 |
| Taxes | | | 2,131 | 964 | 647 | 647 | | 566 | |
| Utilities | 59,417 | 124,783 | 26,157 | 37,092 | 26,682 | 33,873 | 93,161 | 41,499 | 60,867 |
| Vehicles | 10,261 | 7,807 | 7,207 | 6,405 | 5,814 | 12,623 | 19,460 | 8,314 | 5,003 |
| Total Disbursements | $ 1,734,193 | $ 2,453,919 | $ 2,254,282 | $ 2,029,257 | $ 1,840,087 | $ 2,017,846 | $ 2,367,626 | $ 1,916,440 | $ 1,841,500 |
| **Net Cash Flow** | $ 235,243 | $ (210,569) | $ (73,714) | $ 28,095 | $ 275,453 | $ (93,683) | $ (556,812) | $ 121,965 | $ (35,471) |
| **Bank Balances[1]** | | | | | | | | | |
| Beginning Balance | $ 1,006,629 | $ 1,483,855 | $ 1,273,286 | $ 1,199,572 | $ 1,227,667 | $ 1,503,120 | $ 1,409,437 | $ 852,625 | $ 974,590 |
| Additional Depository Accounts | 241,983 | | | | | | | | |
| Ending Balance | $ 1,483,855 | $ 1,273,286 | $ 1,199,572 | $ 1,227,667 | $ 1,503,120 | $ 1,409,437 | $ 852,625 | $ 974,590 | $ 939,119 |

[1] Ending bank balances do not represent surplus cash and do not account for outstanding checks. The majority of the monthly bank balances are used to fund future recurring costs, such as month end payroll, insurance, subsequent month's lease/rent payments, future service provider commitments, etc.

# Global NAPs, Inc. v. Verizon New England Inc.
## Schedule of Cash Receipts and Disbursements
### January 1, 2011 through October 31, 2011
### (Cash Basis of Accounting)

| | 2011 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | January | February | March | April | May | June | July | August | September | October |
| **Cash Receipts** | | | | | | | | | | |
| Customer/Other Deposits | $ 848,812 | $ 776,627 | $ 803,347 | $ 709,311 | $ 990,026 | $ 719,125 | $ 680,922 | $ 710,081 | $ 664,090 | $ 679,890 |
| Subscriber Credit Card/Other Deposits | 957,217 | 884,020 | 1,106,882 | 892,612 | 914,206 | 983,445 | 883,317 | 893,192 | 884,054 | 827,469 |
| Transfer In For Administrative Costs[1] | - | - | 315,342 | 330,645 | 39,763 | 299,654 | 173,970 | 178,933 | 255,662 | 228,852 |
| Total Receipts | $ 1,806,029 | $ 1,660,647 | $ 2,225,571 | $ 1,932,568 | $ 1,943,995 | $ 2,002,224 | $ 1,738,709 | $ 1,782,206 | $ 1,803,806 | $ 1,735,992 |
| **Cash Disbursements** | | | | | | | | | | |
| Aircraft | $ 57,886 | $ 62,875 | $ 4,746 | $ 16,144 | $ 10,287 | $ 6,137 | $ - | $ 2,923 | $ - | $ - |
| Employee Expenses/Travel/Meals | 2,100 | 7,053 | 2,464 | 5,733 | 5,206 | 10,469 | 4,746 | 16,441 | 16,076 | 7,877 |
| Fiber Optics | 231,775 | 144,292 | 358,412 | 134,764 | 354,639 | 194,306 | 258,762 | 181,982 | 331,807 | 167,783 |
| Industry Services | 523,180 | 346,114 | 478,395 | 421,375 | 496,309 | 400,151 | 398,725 | 283,538 | 403,662 | 403,280 |
| Insurance | 388 | 910 | - | 2,691 | 875 | 9,935 | 75,988 | 4,826 | 3,811 | 24,553 |
| Legal/Consultants[2] | 190,565 | 158,163 | 419,981 | 414,963 | 134,281 | 276,910 | 248,940 | 276,177 | 338,694 | 194,348 |
| Mailings/Phone Delivery | 4,529 | - | 11,896 | 3,730 | 8,412 | 1,642 | 7,384 | 3,479 | 3,940 | 4,238 |
| Maintenance | 12,244 | 2,333 | 9,824 | 8,415 | 16,042 | 3,622 | 14,204 | 5,686 | 5,264 | 17,301 |
| Marketing | - | - | 9,445 | 7,779 | - | - | - | - | - | - |
| Medical Insurance | 68,276 | 69,440 | 70,225 | 70,225 | 120,409 | 68,463 | 84,871 | 67,977 | - | 72,385 |
| Misc/Other | 5,854 | 11,318 | 11,517 | 18,800 | 13,098 | 15,814 | 10,747 | 16,415 | 13,636 | 10,799 |
| Payroll | 415,253 | 424,876 | 459,640 | 441,148 | 446,977 | 435,945 | 498,397 | 462,858 | 460,256 | 420,243 |
| Payroll (taxes, processing, benefits) | 121,726 | 332,777 | 218,924 | 189,397 | 191,014 | 182,901 | 177,316 | 174,890 | 196,692 | 173,900 |
| Rent | 141,854 | 122,808 | 89,954 | 133,427 | 119,507 | 126,269 | 125,749 | 114,065 | 114,929 | 136,514 |
| Taxes | - | 150 | 456 | 1,400 | 1,400 | 25 | 1,233 | - | - | - |
| Utilities | 60,867 | 46,068 | 45,893 | 37,966 | 21,715 | 52,911 | 46,369 | 22,733 | 54,703 | 42,908 |
| Vehicles | 5,003 | 9,841 | 23,643 | 17,083 | 12,422 | 22,151 | 23,350 | 12,899 | 2,551 | 20,350 |
| Total Disbursements | $ 1,841,500 | $ 1,739,018 | $ 2,215,425 | $ 1,922,639 | $ 1,952,593 | $ 1,807,651 | $ 1,977,381 | $ 1,646,895 | $ 1,946,021 | $ 1,700,379 |
| **Net Cash Flow** | $ (35,471) | $ (78,371) | $ 10,146 | $ 8,929 | $ (8,598) | $ 194,573 | $ (238,672) | $ 195,311 | $ (142,215) | $ 35,573 |
| **Bank Balances[3]** | | | | | | | | | | |
| Beginning Balance | $ 974,590 | $ 939,119 | $ 860,748 | $ 870,894 | $ 879,823 | $ 871,225 | $ 1,065,798 | $ 827,126 | $ 1,022,437 | $ 880,222 |
| Ending Balance | $ 939,119 | $ 860,748 | $ 870,894 | $ 879,823 | $ 871,225 | $ 1,065,798 | $ 827,126 | $ 1,022,437 | $ 880,222 | $ 915,794 |

[1] Transfer In For Administrative Costs represents funds for operations and to pay receivership related costs.

[2] Legal/Consultants represent payments for prior and ongoing legal services (non-receivership related), consultants supporting operations, and receivership related costs.

[3] Legal bank balances do not represent surplus cash and do not account for outstanding checks. The majority of the monthly bank balances are used to fund future recurring costs, such as month end payroll, insurance, subsequent month's lease/rent payments, future service provider commitments, etc.

**Global NAPs, Inc. v. Verizon New England Inc.**
**Schedule of Cash Receipts and Disbursements**
**November 1, 2011 through April 30, 2012**
**(Cash Basis of Accounting)**

|  | 2011 | | 2012 | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | November | December | January | February | March | April |
| **Cash Receipts** | | | | | | |
| Customer/Other Deposits | $ 482,620 | $ 480,624 | $ 394,290 | $ 929,034 | $ 19,644 | $ 77,572 |
| Subscriber Credit Card/Other Deposits | 804,805 | 859,122 | 780,509 | 735,534 | 824,542 | 700,743 |
| Transfer In For Administrative Costs[1] | 367,086 | 445,720 | 1,297,007 | 1,025,977 | (44,607) | 408,747 |
| Total Receipts | $ 1,654,511 | $ 1,785,466 | $ 2,471,806 | $ 2,690,545 | $ 799,580 | $ 1,187,062 |
| **Cash Disbursements** | | | | | | |
| Employee Expenses/Travel/Meals | $ 4,624 | $ 4,464 | $ 3,960 | $ 2,584 | $ 9,436 | $ 4,977 |
| Fiber Optics | 189,415 | 363,335 | 147,922 | 94,863 | - | - |
| Industry Services | 352,625 | 375,374 | 416,392 | 198,660 | 263,231 | 280,285 |
| Insurance | 3,954 | 3,557 | 4,092 | 1,065 | 6,693 | 804 |
| Legal/Consultants[2] | 414,442 | 517,895 | 568,423 | 573,165 | 290,207 | 536,853 |
| Mailings/Phone Delivery | 3,681 | 446 | 3,893 | 10,619 | 7,523 | 9,376 |
| Maintenance | 8,280 | 5,948 | 5,251 | 6,529 | 6,207 | 2,919 |
| Marketing | 2,780 | 1,549 | - | - | - | 6,856 |
| Medical Insurance | 73,206 | 71,302 | 61,334 | 64,080 | 67,965 | (18,305) |
| Misc/Other | 11,653 | 9,176 | 9,205 | 6,223 | 7,627 | 2,864 |
| Payroll | 414,673 | 383,987 | 477,546 | 469,165 | 269,182 | 201,655 |
| Payroll (taxes, processing, benefits) | 171,199 | 176,438 | 355,981 | 120,130 | 156,806 | 107,616 |
| Rent | 90,227 | 145,983 | 129,258 | 113,255 | 75,339 | 69,602 |
| Taxes | - | - | 300 | - | - | 100 |
| Utilities | 16,923 | 56,459 | 32,387 | 36,658 | 52,968 | 31,217 |
| Vehicles | 12,328 | 11,795 | 3,958 | 7,862 | 9,349 | 6,946 |
| Total Disbursements | $ 1,769,990 | $ 2,127,708 | $ 2,219,880 | $ 1,704,838 | $ 1,222,553 | $ 1,243,765 |
| **Net Cash Flow** | $ (115,479) | $ (342,242) | $ 251,926 | $ 985,687 | $ (422,953) | $ (56,703) |
| **Bank Balances[3]** | | | | | | |
| Beginning Balance | $ 915,794 | $ 800,315 | $ 458,073 | $ 709,999 | $ 1,695,686 | $ 1,272,733 |
| Ending Balance | $ 800,315 | $ 458,073 | $ 709,999 | $ 1,695,686 | $ 1,272,733 | $ 1,216,030 |

[1] Transfer In For Administrative Costs represents funds needed for operations and receivership related costs.

[2] Legal/Consultants includes costs relating to security, IT and HR consulting, consultants supporting operations, and receivership related costs.

[3] Ending bank balances do not represent surplus cash and do not account for outstanding checks. The majority of the monthly bank balances were used to fund future recurring costs, such as month-end payroll, insurance, subsequent month's lease/rent payments, future service provider commitments, etc.

# EXHIBIT D

## RULE 2016-1.    APPLICATION FOR COMPENSATION

(a)    Any Professional seeking interim or final compensation for services and reimbursement of expenses under 11 U.S.C. §§ 330, 331, 503(b)(2), 503(b)(4) or 506(b), excluding any broker (other than an investment banker) whose compensation is determined by a commission on the sale price of an asset, shall file an application for compensation and reimbursement. The application shall conform generally to Fed. R. Bankr. P. 2016.

    (1)    The application and any attachments shall:

        (A)    be legible and understandable;

        (B)    identify the time period or periods during which services were rendered;

        (C)    describe the specific services performed each day by each person with the time broken down into units of tenths of one hour devoted to such services;

15

(D)    include a copy of any contract or agreement reciting the terms and conditions of employment and compensation;

(E)    include a copy of the order authorizing the employment;

(F)    include the date and amount of any retainer, partial payment or prior interim allowances;

(G)    include a brief narrative description of services performed and a summary of hours by Professionals and other personnel;

(H)    if the trustee is also serving as his or her own attorney, the trustee's attorney's application must contain:

    (i)    a certification that no compensation has been or will be sought for services as an attorney which are properly trustee services; and

    (ii)    include a brief biography of each person included in the fee application, stating his or her background and experience.

(2)    All applications by Professionals shall include a summary chart, which clearly sets forth in columns:

(A)    the full names of the attorneys, paralegals and clerks performing services;

(B)    the initials used for each person;

(C)    the hourly rate charged by each person and, if there is a change in the hourly rate for any such person during the covered period, then that person's name shall be listed as many times as there are changes in the hourly rate and each entry shall show the number of hours at each rate and the date each change became effective;

(D)    the total amount of fees for each person and a column showing a grand total figure (See MLBR Appendix 6(b)(7) Fee Applications); and

(E)    the total amount of each type of out-of-pocket expense for which reimbursement is sought, which amounts, subject to subsection (F), shall not exceed the actual cost to the applicant.

(F)    In lieu of calculating the actual cost of the expenses set forth below, the applicant may request the rates of reimbursement set forth in MLBR Appendix 2 for:

    (i)    copies;

    (ii)    incoming telecopier/facsimile transmissions; and

16

(iii)    auto mileage.

(b)    Any application for compensation by co-counsel shall specify the separate services rendered by each counsel and contain a certification that no compensation is sought for duplicate services.

(c)    If an application for compensation and reimbursement by a chapter 7, 11 or 12 trustee exceeds $5,000.00, the trustee shall state:

    (1)    the total amount received in the estate;

    (2)    the amount of money disbursed and to be disbursed by the trustee to parties in interest (excluding the debtor) and a calculation of the maximum fee allowable under 11 U.S.C. § 326;

    (3)    a brief narrative description of services performed;

    (4)    if the payment sought is interim compensation, why the payment of interim compensation is reasonable and appropriate; and

    (5)    the dividend, expressed as a percentage of funds to be distributed to creditors, if the requested compensation and other requested administrative expenses are allowed in the amounts requested. If a trustee has served both as a chapter 7 and a chapter 11 trustee, separate itemizations must be provided for each period. The amount of compensation shall be stated as a dollar amount, regardless of the calculation of the maximum compensation allowable under 11 U.S.C. § 326(a).

(d)    (1)    All applications which seek more than $35,000.00 in compensation, or are otherwise very lengthy, must be divided into narrative sections and must utilize the project categories set forth in subsection (2) below. Each narrative section within each project category must represent a task, must describe the task and the benefit to the estate, and must identify the work done by each Professional. There shall be attached to each narrative section a specific description of services performed under such project category each day by each person and the time devoted to such services on that day by each person. The end of each narrative section must include a summary chart that conforms to the requirements of section (a)(2)(A)-(F) of this Rule.

    (2)    The following project categories (as described below) are to be utilized in all applications submitted pursuant to this Rule. Applications may contain additional categories as may be required in a particular case:

17

(A)     Asset Analysis and Recovery: identification and review of potential assets including causes of action and non-litigation recoveries, and appraisals of assets;

(B)     Asset Disposition: sales, leases, matters under 11 U.S.C. § 365, abandonment and related transaction work;

(C)     Business Operations: issues related to debtor-in-possession operating in chapter 11 cases, such as employee issues, vendor issues, lease and contract issues and other similar matters, as well as analysis of tax issues and preparation of tax returns;

(D)     Case Administration: coordination and compliance activities (including preparation of statements of financial affairs, schedules, lists of contracts, and United States trustee interim statements and operating reports), contacts with the United States trustee, and general creditor inquiries;

(E)     Claims Administration and Objections: specific claim inquiries, bar date motions, analyses, objections and allowance of claims;

(F)     Employee Benefits and Pensions: issues such as severance, retention, 401(k) coverage and continuance of pension plans;

(G)     Employment Applications and Objections: preparation of employment applications, motions to establish interim compensation procedures, and review of and objections to employment applications of others;

(H)     Fee Applications and Objections: preparation of fee applications and review of and objections to fee applications of others;

(I)     Financing: matters under 11 U.S.C. §§ 361, 363 and 364, including cash collateral and secured claims, and analysis of loan documents;

(J)     Litigation: a separate category should be utilized for each litigation matter;

(K)     Meetings of creditors: preparing for and attending conference of creditors, meetings held pursuant to 11 U.S.C. § 341, and other Creditors Committee meetings;

(L)     Plan and Disclosure Statement: formulation, presentation and confirmation, compliance with confirmation order, related orders and rules, disbursement and case closing activities (except those relating to allowance of any objections to claims); and

(M) Relief from Stay Proceedings: matters relating to termination or continuation of automatic stay under 11 U.S.C. § 362.