# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| Global Naps, Inc., | ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION NO. 02-12489-RWZ |
| vs. | ) ) | CIVIL ACTION NO. 05-10079-RWZ |
| Verizon New England, Inc., | ) ) | |
| Defendant. | ) ) | |

**RESPONSE AND OPPOSITION TO RECEIVER'S RECOMMENDATION AND AMENDED RECOMMENDATION ON CLAIMS (ECF NOS. 991 AND 1003) AS TO THE NATIONAL RAILROAD PASSENGER CORPORATION**

The National Railroad Passenger Corporation ("Amtrak")[1], through counsel, hereby submits this Response and Opposition to Receiver, Carl F. Jenkins's, Recommendation and Amended Recommendation on Claims, Docket Nos. 991 and 1003, dated June 24, 2013, and July 5, 2013 (the "Recommendation"). In support of this Response, Amtrak respectfully states as follows:

**INTRODUCTION**

Since the Receiver was appointed, counsel for, and representatives of, both Amtrak and the Receiver, have engaged in a cooperative dialogue with respect to the status of multiple license agreements (collectively, the "Amtrak Agreements", as that term is defined below)

---

[1] Amtrak is a District of Columbia corporation established in 1970 pursuant to the Rail Passenger Service Act. *See* 49 U.S.C. § 24101, *et seq.* (formerly 45 U.S.C. §§ 501-658). Amtrak's principal office and place of business is located at 60 Massachusetts Avenue, N.E., Washington, D.C. 20002. The United States owns more than 50 percent of Amtrak's common stock and of its preferred stock. Through the Secretary of Transportation, the United States holds a first mortgage on all Amtrak property to secure the billions of dollars in funding that it has advanced (and continues to advance) to acquire and improve Amtrak's properties and operations.

between Global NAPS, Inc. ("Global NAPS") and Amtrak, as well as license fees and other payments due to Amtrak thereunder. In the course of these communications, the Receiver and Amtrak have engaged (and continue to engage) in cooperative efforts to, among other things, (i) reconcile amounts due to Amtrak under the Amtrak Agreements, (ii) consensually conclude the Lancaster Transaction pursuant to this Court's Order (Docket No. 713), and (iii) address Amtrak's concerns with respect to the sales of assets, the disposition of the proceeds of such sales by the Receiver, and the settlement of claims. Throughout the process, Amtrak has sought to be "part of the solution" rather than "part of the problem."[2]

### EXECUTIVE SUMMARY OF ARGUMENT

Amtrak submits that the Judgment Creditors, as that term is defined below, should not participate in any proposed pro rata distribution of allowed post-receivership claims until the allowed post-receivership claims of non-Judgment Creditors have been paid in full for the following reasons:

- The Receivership Estate was created at the Judgment Creditors' sole request, and for their sole benefit, as they attempted to collect on a judgment previously issued by this Court. The Judgment Creditors were granted virtually exclusive rights to access the Receivership Estate's financial data and reports, and were aware (or should have been

---

[2] In submitting this Response and Opposition, Amtrak incorporates by reference the matters set forth in its previously filed Responses, including, but not limited to, those with respect to the sales of assets, settlement of claims, and a motion to compel payment and disclosure, (Docket Nos. 771, 798, 857, 859, 893, 897, 925, 947, and 968), as well as a currently pending motion to resolve a portion of Amtrak's claim. (Docket No. 1024). Amtrak respectfully reserves and preserves all of its rights under the Amtrak Agreements and otherwise, and the filing of this Response and Opposition is not intended to be, and shall not be construed as, an election of remedy, a waiver of any past, present, or future defaults or events of default waiver or other limitation on any of Amtrak's rights.

aware) that the Receivership Estate was administratively insolvent from inception, if post-receivership charges for Judgment Creditors' services were taken into account.

- In exchange for this preferential treatment over the Judgment Debtors' other creditors, the Court's Order appointing the Receiver stated that the Judgment Creditors would bear at least some of the Receiver's costs, and the Judgment Creditors have acknowledged that they would be liable for these expenses in the event that the Receivership Estate's assets were insufficient to satisfy such costs.

- Other parties, such as Amtrak, continued to provide goods and services to the Receivership Estate in good faith from inception through termination of the Estate's business operations, with the understanding that such bona fide post-receivership administrative expenses would be paid in the ordinary course of business operations conducted by the Receivership Estate.

- Despite being aware of the Receivership Estate's administrative insolvency (if the Judgment Creditors' post-receivership claims are taken into account), the Judgment Creditors assert that they have billed the Receivership Estate more than $129 million for services rendered during the course of the receivership, with the knowledge that they had no hope of recouping the value of those alleged services.

- The Judgment Creditors have recovered – dollar for dollar – approximately $21.5-$22 million of their pre-receivership judgment, and retain rights to recover from sources unavailable to non-Judgment Creditor post-receivership creditors.

- The Judgment Creditors have not objected to the Receiver's conduct of the receivership or the payment of the Receivership Estate's operational expenses, including payment of non-Judgment Creditors' post-receivership claims.

- Under these circumstances, the Court has wide discretion to prohibit the Judgment Creditors from sharing in the distribution of the insolvent Receivership Estate's assets to bona fide, third party post-receivership creditors.

In addition, Amtrak objects to the Recommendation because:

- The Recommendation has not provided specific factual or legal bases under Massachusetts law for its determinations about which post-receivership claims should be allowed, and in what amounts.

- To the extent the Recommendation relies on Massachusetts law permitting a federal receiver to reject certain executory contracts, such state laws are preempted by, among other things, the Bankruptcy Code.

- Permitting the Receivership Estate to take and use goods and services from non-Judgment Creditor post-receivership creditors for goods provided and services rendered, without compensation and for the benefit of the Judgment Creditors, would violate the constitutional rights of the non-Judgment Creditor unpaid post-receivership creditors.

## FACTUAL BACKGROUND

### The Court's Entry of Judgment and Appointment of the Monitor and Receiver

1. On January 29, 2009, the Court entered judgment in favor of Defendant/Counterclaim Plaintiff Verizon New England, Inc. ("Verizon"), and against Global Naps, Frank Gangi, Ferrous Miner Holdings, Ltd., Global NAPs New Hampshire, Inc., Global NAPs Networks, Inc., and Global NAPs Realty, Inc. (collectively, "Judgment Debtors"), in the amount of $57,716,714. (Docket No. 539).

2.	At the request of Verizon and the Southern New England Telephone Company ("SNET") (together, "Judgment Creditors"),[3] the Court appointed a Monitor "to oversee and monitor the flow of funds into and out of the Judgment Debtors" in order to "preserve both the companies' assets and the ability of [the Judgment Creditors]" to satisfy their respective judgments." (Order Appointing Monitor at 3, Docket No. 589). The Court's Order required the Monitor to provide monthly financial statements to the Judgment Creditors (and only the Judgment Creditors). (*Id.* at p. 7). The Judgment Creditors were responsible for 50 percent of the Monitor's reasonable expenses, including the Monitor's fees, under this Order. (*Id.* at pp. 7-8). It is Amtrak's understanding that the Judgment Creditors actually paid such expenses and fees during the Monitor's tenure. (Verizon's Memo. in Response to the Receiver's Third Expedited Motion for Further Instructions and Orders, Docket No. 710, Mar. 17, 2011 ("Verizon's Resp. to Receiver's Third Mot.") at 6 n.4).

3.	In May 2009, Verizon filed a motion requesting that the Monitor be replaced by a receiver for certain of the Judgment Debtors, including Global Naps, Ferrous Miner Holdings, Ltd., Global NAPs New Hampshire, Inc., Global NAPs Networks, Inc., Global NAPs Realty, Inc., Global NAPS Financial, Inc., and other entities (collectively, the "Global NAPS Entities")

---

[3] In 2008, the U.S. District Court for the District of Connecticut entered a judgment against Global Naps, Inc., Global NAPs New Hampshire, Inc., Global NAPs Realty, Inc., and Ferrous Miner Holdings, Ltd., and in favor of SNET in the amount of $5,893,542.86. (Order Appointing Monitor at 3 n.2, Docket No. 589). Amtrak's understanding is that Verison also represents SNET's interest in the receivership, and therefore statements by Verizon or its counsel may be alternatively attributed to the Judgment Creditors or Verizon in this Memorandum.

and assets as set forth in Paragraph 2 the Court's Order for Appointment of Keeper and Receiver dated May 6, 2010 .  (Order for Appointment of Keeper and Receiver, Docket No. 617).[4]

4.      At the May 5, 2010, hearing on Verizon's motion, counsel for Verizon (apparently speaking for the Judgment Creditors) stated that a receivership was necessary to expedite the sale of the Global NAPS Entities and maximize the Judgment Creditors' recovery on the judgment. (May 5, 2010 Hearing Transcript, Docket No. 619 ("May 5th Hearing"), 6:4-15).  The Judgment Creditors emphasized that a quick sale would be required for the Judgment Creditors to have any hope of even recovering "any value" from the judgment, and that a receiver could be expected to conduct such sales within a "month or 60 days" of being appointed.  (*Id.* at 6:7-10, 10:15-18). The Judgment Creditors stated that they would "take our chances with the receiver" in terms of trying to recover the judgment amount, (*id.* at 10:15-18), instead of attempting to "have the marshals or the sheriff start to sell [the Judgment Debtors' assets] off."  (*Id.* at 15:3-6; *see also* Docket No. 559 (noting 17 writs of execution were issued by the Court on March 2, 2009); Verizon's Resp. to Receiver's Third Mot. at 6-7 (noting that Verizon chose to pursue a receivership for the Judgment Debtors "rather than conducting a 'fire sale' auction")).

5.      The Judgment Creditors intended that the receivership operate for their own sole benefit.  Verizon specifically noted that "Verizon did not move this Court for a general receivership.  Rather . . . Verizon moved for a receiver to supervise the accounts of the Judgment Debtors only for so long as it took to marshal and monetize" assets to satisfy the Judgment Creditors' judgment.   (Verizon's Resp. to Receiver's Third Mot. at 10).

---

[4] Verizon's Motion for Contempt Sanctions, Preliminary Injunction, Appointment of a Receiver and to Reach and Apply Shares (Docket No. 574) was filed under seal and is not available for Amtrak to directly examine.

6.       Verizon acknowledged, even if the Court appointed a receiver, that "[t]here's no realistic chance that [the Global NAPS Entities are] going to sell for enough to cover [Verizon's] judgment or SNET's judgment or any of the other judgments that are floating around."  (May 5th Hearing 7:2-4).

7.       Verizon also claimed that, in the absence of a receiver, Mr. Gangi would continue to "drain[] [the Global Naps Entities] dry."  (*Id.* at 12:3-6).  In support of this statement, Verizon cited the fact that the Global Naps was purportedly losing up to $500,000 per month, (*id.* at 11:7-9), and that the company's cash reserves had dwindled from $2.4 million in August 2009 to $1 million as of February 2010.  (*Id.* at 7:7-17).

8.       Following the hearing, on May 6, 2010, the Court entered an order appointing a receiver for the Global Naps Entities.  (Order for Appointment of Keeper and Receiver, Docket No. 617, as amended by Docket No. 624).  Similar to the Monitor, the Receiver is only required to provide financial reporting to the Court and the Judgment Creditors.  (Amended Order for Appointment of Keeper and Receiver, Docket No. 624, May 13, 2010 ("Receivership Order"), ¶¶ 5-7).

9.       The Receivership Order provides that the "Receiver may submit the Receiver's expenses to the parties for payment, including the Receiver's compensation, [with] such expenses to be borne as follows:  90 percent by Verizon, and 10 percent by SNET."  (*Id.* ¶ 14).  Similarly, the Receivership Order states that 90 percent of the property collected by the Receiver shall be distributed to Verizon, while the remaining 10 percent shall be distributed to SNET, in order to satisfy their respective judgments.  (*Id.* ¶ 16).  The Receiver, Judgment Debtors, and Judgment Creditors are specifically permitted to, at any time, apply to the Court "for further instructions and orders related to this Order and for additional powers necessary to enable the Receiver to

perform the Receiver's duties on noticed motion." (*Id.* ¶ 12). The property held by the Receiver pursuant to the Receivership Order is referred to herein as the "Receivership Estate."

10.     The Receiver's engagement letter with its counsel provides that the Receiver's counsel's "fees and expenses are payable by the Receivership Estate, and/or [the Judgment Creditors], as the Court may deem appropriate." (Receiver, Carl F. Jenkins's Application for Authority to Employ Counsel, Docket No. 618, Ex. A; Joint Notice of Non-Opposition to Receiver, Carl F. Jenkins's Application for Authority to Employ Counsel, Docket No. 621, May 10, 2010).[5]

11.     The Judgment Creditors assert that they are secured creditors with a first priority security interest in all Receivership Estate assets. (Verizon's Resp. to Receiver's Third Mot. at 2).

12.     The Judgment Creditors have acknowledged that they are responsible for paying the receivership's expenses in the event the assets of the receivership are insufficient to cover those expenses. (Verizon's Memo. in Opposition to Frank Gangi's Motion to Compel Payment of Receivership Expenses, Docket No. 831, Feb. 21, 2012 ("Verizon's Opp'n to Gangi's Mot. to Compel Payment"), at 6).

---

[5] It is impossible to tell from the financial data currently available to Amtrak, how much the receivership estate has paid to date in legal fees, and what portions of those fees were incurred in connection with the ongoing operation of the receivership. However, according to the Receivership Estate's reporting, the Receivership Estate spent $7,775,762 on legal and consultants fees between May 2010 and April 2012, or an average of $323,990.08 per month during this time frame. (Motion of the Universal Service Administrative Company (I) to Compel Receiver to Provide Accounting, (II) to Compel Receiver's Professionals to Submit Fee Applications, (III) to Prohibit Receiver From Further Transferring Receivership Property, and (IV) to Require the Receiver and/or Verizon to Pay Post-Receivership Claim, Docket No. 1016, July 8, 2013 ("USAC's Motion to Compel"), Exs. A-C.).

13.     While the Receivership Estate was created for the sole benefit of the Judgment Creditors, the Receiver himself has stated that the assets of the Receivership Estate should first be applied to the "costs and expenses of administration of the Receivership Estate," and not simply distributed to the Judgment Creditors without regard to the Receivership Estate's other creditors.  (Memo. in Supp. of the Receiver's Third Expedited Motion for Further Instructions and Orders, Docket No. 709, at 4-5).

**Amtrak's Claim and the Operation of the Receivership**

14.     Despite the Judgment Creditors' stated expectation that the Receiver could quickly act to sell the Global NAPS Entities' assets, the receivership remains open and ongoing more than three years after the Court first created the Receivership Estate at the Judgment Creditors' request.  The Receivership Estate was only been able to continue to operate the Global NAPS Entities with the assistance of numerous companies that continued to provide services to the Receiver.  (*See* Recommendation at 3-6).

15.     For example, Amtrak has provided vital and valuable services to the Global Naps Entities through certain licenses (the aforementioned "Amtrak Agreements"), such as for space, fibers (in cables), shelters, a maintenance-of-way base, conduits, and ducts in, on and/or adjacent to Amtrak rights of way and structures in and from Boston, MA through (i) Providence, R.I., (ii) New Haven, CT, (iii) New York Penn Station, (iv) Philadelphia 30th Street Station, (vi) Wilmington (DE) Station, and (vii) Baltimore, MD, to (viii) Washington, D.C., in which the Global Naps Entities installed, operated, and maintained telecommunications facilities used in providing, among other things, internet access and local phone services to its customers.  These leases have long been considered valuable assets of the Receivership Estate.  The consultant retained by the Receiver, with the Court's permission, to provide technology consulting services

to the Receiver filed a report in June 2010 stating that these fiber assets "will be of greatest interest to potential acquirers" of the Global NAPS Entities. (Motion by Receiver, Carl F. Jenkins, for Authority to Employ Technology & Investment Consulting Company, Ex. A § 1, Docket No. 627). In February 2012, in connection with a motion to approve the sale of certain receivership assets free and clear of liens, claims, interests, and encumbrances, the Court specifically permitted the Receiver "the opportunity to dispose of Amtrak [] Agreements . . . separately to recover additional funds" for the Receivership Estate, implicitly recognizing the value that these assets held to the estate. (Supp. Order to this Court's December 16, 2011 Order Authorizing the Sale of Certain Receivership Assets Free and Clear of All Liens, Claims, Interests and Encumbrances to Quality Speaks, LLC, Docket No. 827, Feb. 14, 2012).

16. The Judgment Creditors have stated that they do "not object to the payment of post-receivership amounts due and owing" to the post-receivership creditors of the Receivership Estate. (Verizon's Memo. in Response to Universal Serv. Admin. Co.'s Motion for an Order Requiring the Receiver to Make Payment and Provide Financial Information, Docket No. 729, June 21, 2011, at 1).

17. Unfortunately, the Receivership Estate has not been able to generate sufficient revenues from operations, asset sales, and other recoveries to cover these necessary post-receivership expenses. While the Receiver has conducted sales of a "significant number of assets including, but not limited to, real estate, the operating businesses, aircraft, automobiles, and other and varies personal property" belonging to the Global NAPS Entities, (Recommendation at 2), the receivership has operated at what appears to be a significant cash flow deficit (when factoring in charges for the Judgment Creditors' post-receivership services). *Compare* Recommendation at 3-6 (listing hundreds of millions of dollars of post-receivership claims) *with*

Decl. of Philip G. Cormier, Ex. A (Transcript of April 24, 2013 Hearing), Docket No. 994, 14:3-7 (quoting the Court as stating that the receivership currently has only $3 million in funds); *see also* USAC's Motion to Compel, Exs. A-C (showing that the ending monthly balance in the Receivership Estate's account has dropped from $1,483,855 at the end of May 2010, to $1,216,030 at the end of April 2012, before factoring in, or even mentioning, payments owed to certain post-receivership creditors such as Verizon). In fact, as of at least February 2012 the Judgment Creditors had "yet to realize a dollar" on their judgment. (Verizon's Opp'n to Gangi's Mot to Compel Payment at 1).

18.     Verizon is one of only three entities (along with the Court and SNET) entitled to receive the Receiver's financial reports as a matter of course, and as a result, Verizon has had reason to know that the Receivership Estate has been incurring losses (when factoring in charges for the Judgment Creditors' post-receivership services) from the inception of the receivership. Notwithstanding this knowledge, the Judgment Creditors have not moved to terminate the receivership; instead, they now assert administrative claims for having provided such post-receivership services to the Global NAPS Entities in the amount of $129,481,450.00. (Recommendation at 6). This would mean that, for the approximately 39 months that the receivership has been in place, Verizon claims to have provided services to the estate in an amount of more than $3 million per month. (*See also* Verizon's Memo. in Opp'n to Frank Gangi's Mot. to Compel Payment at 9 (asserting that Verizon has provided at least $2 million in services each month)). Upon information and belief, the Judgment Creditors' administrative claims were not asserted on the record until 2012, near the end of the active operation of the Global NAPS Entities as ongoing business concerns. (*See id.*)

11

19.     In fact, according to Verizon's own filings in this case, the services Verizon has provided to the Receiver "dwarf any amount of money that could possibly be due the [r]eceivership." (Verizon's Opp'n to Gangi's Mot to Compel Payment at 10 n.8). Thus, assuming a valid basis for Verizon's claims, Verizon's post-receivership claims alone have rendered the Receivership Estate administratively insolvent.

20.     On August 10, 2012, the Receiver filed a motion requesting that the Court approve a settlement agreement the Receivership Estate had reached with Verizon and its affiliates, in which Verizon agreed to reduce its pre-receivership judgment amount by some $21.5 - $22 million in exchange for the Receivership Estate's release of certain claims against Verizon and its affiliates. (Receiver, Carl F. Jenkins's Motion for Court Approval of Settlement of Disputed Matters with Verizon Pending in the Eastern District of New York, Docket No. 889, Aug. 10, 2012). This settlement provided for a dollar for dollar reduction of the Judgment Creditors' pre-receivership claim against the Judgment Debtors. Amtrak did not oppose the entry of the settlement agreement, but highlighted the dollar for dollar reduction of the Judgment Creditors' prior claim and respectfully submitted and requested that "approval of the settlement and the recovery resulting therefrom . . . be taken into account when the Court addresses the allowance and payment of amounts due to Amtrak (as well as other [Receivership] Estate creditors) for post-Receivership Date value given to/for the benefit of the Receivership Estate." (Response of Amtrak to Receiver's Motion for Court Approval of Disputed Matters with Verizon Pending in the Eastern District of New York, Docket No. 897, Aug. 24, 2012, ¶ 3).

**Receiver's Recommendation on Claims**

21.    On July 5, 2013, the Receiver filed the Recommendation.  In this filing, and in the Amended Recommendations, the Receiver recommends that the Court allow a total of $37,949,642.14 of the post-receivership claims that have been submitted.

22.    Included in this total are the Judgment Creditors' administrative expense claims, which the Receiver recommends that the Court allow in the amount of $35,000,000. (Recommendation at 6).  While this initially may seem like a large deduction from the Judgment Creditors' submitted post-receivership claim of $129,481,450, there are 30 other creditors, including Amtrak, which hold combined recommended allowed claims of $2,949,642.14 (significantly reduced from almost $11 million in actual claims), an amount that is less than 8% of Verizon's single recommended allowed claim. (*Id.* at 3-6).

23.    The Receiver has recommended that the Court allow $979,889.67 of Amtrak's $4,957,759.82 claim, which the Receiver deemed to be a post-receivership claim.[6]

24.    As a result of the receivership's insolvency, the Receiver apparently believes that the recommended allowed claims should be paid on a pro rata basis.  (*Id.* at 6).  If the claims are ultimately paid out in the pro rata manner apparently envisioned, Amtrak would only receive a maximum of $77,462.36 on its claim, assuming the Receivership Estate still has $3 million to pay out to the allowed post-receivership creditors.

25.    The Recommendation contemplates that the Judgment Creditors will retain the right to continue to seek recovery from sources that are unavailable to other creditors. (Recommendation at 5 n.1).

---

[6] Amtrak expressly reserves its right to challenge the Recommendation as to the reduction in the allowable amount of Amtrak's post-receivership claim.

## **ARGUMENT**

**I.**    **If the Receivership Is Insolvent, the Court Should Not Permit Verizon's Allowed Post-Receivership Claim To Be Paid Before the Claims of Bona Fide Third Parties**

The Court should not permit Verizon, as the party which requested that the Court create the Receivership Estate, to use a proposed pro rata distribution scheme to require bona fide third-party creditors (such as Amtrak) which have involuntarily funded the receivership in good faith to absorb further losses to pay a claim for services for which Verizon knew the Estate would never be able to pay.  Instead, Verizon's allowed post-receivership claims should not be paid until or unless the receivership's other allowed post-receivership claims have been paid in full.

The appointment of a receiver in a federal court is an equitable remedy, *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993), and thus the court retains a great deal of discretion over how to allocate the costs of the receivership.  *Atl. Trust Co. v. Chapman*, 208 U.S. 360, 375 (1908); *S.E.C. v. Elliott*, 953 F.2d 1560, 1576 (11th Cir. 1992).  In "special circumstances," it may be "equitable to require the parties, at whose instance a receiver of property was appointed, to meet the expenses of the receivership, when the fund in court is ascertained to be insufficient for that purpose."  *Atl. Trust Co.*, 208 U.S. at 375; *Bowersock Mills & Power Co. v. Joyce*, 101 F.2d 1000 (8th Cir. 1939); *see also In re Indian Motorcycle Litig.*, 307 B.R. 7, 16 (D. Mass. 2004).

In a prior filing, Verizon cited *Bowersock Mills* for the proposition that the party who sought the appointment of the receiver is generally not liable for the receivership's expenses. (Verizon's Opp'n to Gangi's Mot to Compel Payment at 5).  However in this opinion the Eighth Circuit actually concluded that the party that sought the appointment of the receiver was liable for the costs of the receivership.  *Bowersock Mills & Power Co.*, 101 F.2d at 1004.  In *Bowersock Mills*, the Receiver was appointed at the plaintiff's request, and for the plaintiff's "sole

benefit and protection." *Id.* at 1004. There was "nothing in the record to suggest that the receivership was not conducted in accordance with the wishes of the [plaintiff], and nothing to show that, at any time, the [plaintiff] suggested a termination of the receivership, although it must have known that the expense . . . would be out of proportion to its value." *Id.* at 1003-04. Ultimately, the court found that "[b]ecause the court . . . did exactly what the [plaintiff] asked it to do, and did it for the sole benefit of the [plaintiff] and to protect its business and good will, and because the [plaintiff] had as much knowledge as anyone about the value of these deteriorated products which the receiver was to collect and dispose of," the plaintiff should be held liable for the costs of the receivership. *Id.* at 1004.

This case presents similar circumstances. The Judgment Creditors unquestionably sought the appointment of the Receiver for their own benefit. The Judgment Creditors were among a select few entities permitted by the Receivership Order to petition the Court for changes to the Receivership Order or for authorization for the Receiver to take certain actions, demonstrating the Judgment Creditors' high level of control and involvement in the receivership. The Judgment Creditors are also among the few parties with access to the Receiver's ongoing financial information, and therefore must have known that the receivership was operating at a substantial loss well before the Receivership Estate's administrative insolvency was disclosed on the record at the April 24, 2013 hearing. Despite having near-exclusive access to this information, the Judgment Creditors had never requested that the Court terminate the receivership. Instead, the Judgment Creditors assert that they continued to pour more than $129 million into the receivership, knowing that they would never recover these amounts from the Receivership Estate.

15

The third party post-receivership creditors did not have the benefit of the Judgment Creditors' information regarding the receivership's financial state of affairs.  Until 2012 (at a point in time when the Receivership Estate's operation of the Judgment Debtors' business was about to terminate), the Judgment Creditors did not disclose that the receivership had lost and was continuing to lose millions of dollars a month (when factoring in post-receivership charges for the Judgment Creditors' services), an amount which dwarfs the $500,000 a month that the Judgment Debtors were allegedly losing while they remained in control of the Global NAPS Entities prior to the creation of the Receivership Estate.  If this information had been released, Amtrak and other creditors of the Receivership Estate would likely have petitioned the Court to be permitted to discontinue providing services without assurance of payment, or possibly petitioned the Court to terminate the receivership and stop the company from "hemorrhaging money."  (May 5, 2010 Hearing Transcript at 6, Docket No. 619) (describing the pre-receivership state of affairs of the Global NAPS Entities).  Neither Amtrak nor any other similarly situated creditors should have to foot the bill for the attempt to generate profits from the receivership to pay the judgment amount owed to the Judgment Creditors.[7]

---

[7] Section 506(c) of the Bankruptcy Code, which is not applicable in this case but is nonetheless instructive, would command a similar result.  In the bankruptcy context, courts have held that where a secured creditor consents to a debtor's continued operation, "it also impliedly consents to the debtor surcharging the necessary operating expenses of continuing the business against the creditor's secured claim."  *In re Mach., Inc.*, 287 B.R. 755, 768 (Bankr. E.D. Mo. 2002) (discussing the application of 11 U.S.C. § 506(c)).  The current case presents analogous circumstances – the Judgment Creditors here asked the court to appoint the Receiver to continue to operate Global NAPS Entities so as to maximize the Judgment Creditors' potential recovery on the judgment amount against the assets of the Judgment Debtors' estate (although the Receiver disputes the Judgment Creditors' assertions that they are secured creditors).  Based on the financial data provided by the Receiver, which the Judgment Creditors at all times had access to, it was clear that none of Global Naps' other pre-receivership creditors would benefit from the continued operation of Global Naps.  Thus, just as a secured creditor must pay the trustee for expenses incurred in connection with the sale of the creditor's collateral for the creditor's sole

*{footnote continued}*

Further, the plain language of the Receivership Order states that Verizon and SNET are liable for at least certain of the Receiver's expenses. (Receivership Order ¶ 13). The Court's Orders should not be construed to authorize the operation of an insolvent receivership and to force other parties, such as the Receiver himself or third party creditors of the Receivership Estate, to generate more money out of the operation of the Global NAPS Entities through a receivership rather than by initiating sheriff's sales of the Judgment Debtors' individual assets after the judgment was entered back in 2009. (May 5, 2010 Hearing Transcript 15:1-8).

In sum, the Court should not allow Verizon's post-receivership claims in their entirety, as there was never any reasonable expectation that they could be paid. Alternatively, Verizon should not be allowed to collect on any of its allowed post-receivership claims until the Receivership Estate's bona fide third party creditors have been paid on their allowed post-receivership claims in full. It would be inequitable to allow Verizon an entitlement to more than 92 percent of the receivership's remaining assets on the basis of its post-receivership claims, when: (1) the receivership was instituted at the request of and for the sole benefit of the Judgment Creditors (including Verizon); (2) the Judgment Creditors had near exclusive access to information regarding the receivership's financial situation; (3) Verizon knew at the time it provided services to the Receivership Estate that the Estate was losing money at the rate of well over $1 million per month (when factoring in post-receivership charges for Judgment Creditors' services), and that Verizon would never be able to recoup the stated value of those services from the Receivership Estate; (4) despite this knowledge, Verizon never sought to terminate the

_{continued from previous page}_
benefit under § 506(c), the Judgment Creditors should have their allowed distribution on its administrative claims reduced, dollar for dollar, by the losses generated by the Receivership Estate's operation of the Judgment Debtors' businesses that was conducted for the sole purpose of maximizing Judgment Creditors' recovery.

receivership or inform the other creditors of the receivership's financial situation until after business operations were near an end; and (5) the Court's Receivership Order requires Verizon to fund 90 percent of the Receiver's expenses, indicating that not only should Verizon not share in the pool of the Receivership Estate's remaining assets, but that the Judgment Creditors should be liable for any allowed post-receivership expenses that cannot be satisfied out of those assets.[8]

## II.   The Recommendation Has Not Provided a Factual or Legal Basis for the Reduction of Amtrak's Claim

Amtrak also objects to the Recommendation because it does not provide specific factual or legal bases under Massachusetts law for the Receiver's determinations as to which post-receivership claims should be allowed, and in what amounts.  For this reason alone, the Court should reject the Recommendation.

The Recommendation contains an abbreviated history of the receivership and a listing of the claims that the Receiver has received, the latter of which is broken down into pre-receivership claims, post-receivership claims, and the Receiver's recommendation to the Court as to which claims should be allowed.  While Amtrak submitted a claim in the amount of $4,957,759.82, the Recommendation includes only $979,889.67 as an allowed post-receivership expense. The Recommendation cites no specific basis for this reduction.[9]

---

[8] At the least, the portion of the "Legal/Consulting Fees" listed on the Receivership Estate's financial statements for the Receiver's compensation and expenses, and which are for the Receiver's counsel's fees and expenses, should be disclosed, in order to quantify the minimum amount the Judgment Creditors owe the Receivership Estate under the Receivership Order, the Receiver's engagement letter with its counsel, and the Court's Order granting the Receiver's Motion to Appoint Counsel (Docket No. 623).

[9] The amount of Amtrak's claim will be reduced by $137,827 in the event the relief requested in the Receiver's pending Motion for Court Approval of Stipulation and Order for Partial Resolution of Amtrak's Proof of Claim (Docket No. 1024) is granted by the Court.

### A.     <u>Reliance on provisions of the Bankruptcy Code is not warranted</u>

The Recommendation does not provide any explanation as to why Amtrak's post-receivership claim should be reduced by more than 80 percent.[10]  To the extent that Amtrak's claim has been discounted on the basis that the Amtrak Agreements were rejected under Massachusetts law, the Recommendation must be rejected.  The Recommendation cites no such authority for this proposition, and to the extent such authority exists, it is impliedly preempted by the procedures and provisions of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. *Cf. Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005) (holding that a California state statute allowing receivers to void certain preference payments was preempted by provisions of the U.S. Bankruptcy Code).  As a result, the Receiver has no right under Massachusetts law to reject the Amtrak Agreements, and therefore has no basis to disallow the majority of Amtrak's claim.  Section 365 of the Bankruptcy Code, which allows trustees to reject certain executory contracts and relegate the resulting damages to a general unsecured claim, is simply not applicable to this proceeding.  To obtain similar relief, the Judgment Debtors would have been required to file bankruptcy petitions under Title 11 of the United States Code.

---

[10] While Verizon may counter that, under the Recommendation, Verizon's proposed allowed post-receivership claim has been reduced from $129,481,450 to $35,000,000, the remaining combined post-receivership creditors are receiving virtually the same reduction on a percentage basis (approximately 71-73%) on their post-receivership claims. (Recommendation 3-6).

Further, to the extent the Recommendation has discounted Amtrak's post-receivership claim because the Receiver believes Amtrak's post-receivership services have not added value, the record contradicts such a conclusion.  *See supra* ¶ 15.  Regardless, under analogous circumstances, courts have noted that the touchstone for an allowable claim is whether the claim represented an actual and necessary expense of the business, not whether the creditor added value.  *Cf. Reading v. Brown*, 397 U.S. 471 (1968) (holding that damages arising from tort claims entitled to administrative priority under Chapter 11); *In re Resources Tech. Corp.*, 662 F.3d 472 (7th Cir. 2011) (noting that tort liability is an expense of doing business).

**B.** **The Recommendation's proposal to take property from creditors raises constitutional concerns**

Further, the Receiver has no right to essentially take property from the Receivership Estate's creditors in order to pay amounts owed to the Judgment Creditors. To the extent that the Recommendation proposes, through its proposed pro rata distribution scheme, to take money owed to the post-receivership creditors for goods and services provided to the Receivership Estate to operate the Judgment Debtors' business post-receivership, and to pay the proceeds from such operations to the Judgment Creditors, the Receiver's actions raise serious constitutional concerns over the unauthorized taking of the post-receivership creditors' property. The Court can avoid such issues by simply requiring that the Judgment Creditors live with the post-judgment enforcement remedy they have actively and aggressively pursued for more than three years.

**C.** **If Bankruptcy principles apply, Amtrak's claim is entitled to a presumption of validity**

If the Court permits the Receivership Estate to rely upon the Bankruptcy Code by analogy, Amtrak's claim is entitled to a presumption of validity under the Bankruptcy Rules. Bankruptcy Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." This means that "the burden to overcome the presumption of the validity is placed on the objecting party. The mere denial of the validity or amount of a claim is insufficient to accomplish this, and the objecting party must establish at least a prima facie case to overcome the objection." Editors' Comment, Norton Bankruptcy Rules 2011-2012 220 Edition 559 (West 2011). The Recommendation does nothing to overcome the presumptive validity of Amtrak's $4,957,759.82 claim. As set forth above, nothing in the Recommendation substantively attacks the validity of any of the claims submitted to the Receiver, let alone Amtrak's claim specifically. Accordingly,

20

the Recommendation does not provide an adequate factual or legal basis for its recommendation that Amtrak's claim be disallowed in part.

## **CONCLUSION**

For the reasons set forth above, and in the Objections and Motions filed on behalf of the Universal Service Administrative Company (Docket Nos. 1012, 1014, 1016, 1017), the pro rata distribution scheme for post-receivership claims contemplated by the Judgment Creditors apparently by the Recommendation, and the 80% reduction of Amtrak's claim should be rejected.

July 12, 2013

Respectfully submitted,

National Railroad Passenger Corporation
By its attorneys

/s/ Stephen E. Hughes
Stephen E. Hughes, BBO No. 629644
Bonner Kiernan Trebach & Crociata, LLP
200 Portland Street, Suite 400
Boston, MA 02114
(617) 426-3900
shughes@bonnerkiernan.com

and

Andrew Butz (admitted Pro Hac Vice)
Bonner Kiernan Trebach & Crociata, LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
(202) 712-7000
abutz@bonnerkiernan.com

and

Daniel Carrigan (admitted Pro Hac Vice)
McKenna Long Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7436
dcarrigan@mckennalong.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served on July 12, 2013, the within document(s) through the ECF system, and that copies will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Stephen E. Hughes
Stephen E. Hughes
