# Exhibit C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Global Naps, Inc., | ) |
| Plaintiff, | ) CIVIL ACTION NO. 02-12489-RWZ |
| vs. | ) |
| Verizon New England, Inc., | ) CIVIL ACTION NO. 05-10079-RWZ |
| Defendant. | ) |

**NATIONAL RAILROAD PASSENGER CORPORATION'S POST-HEARING MEMORANDUM IN SUPPORT OF ITS RESPONSE AND OPPOSITION TO RECEIVER'S RECOMMENDATION AND AMENDED RECOMMENDATION ON CLAIMS (ECF NOS. 991 AND 1003)**

Amtrak[1] hereby submits this Post-Hearing Memorandum in support of its Response and Opposition to Receiver's Recommendation and Amended Recommendation on Claims, which was filed on July 12, 2013 (Docket No. 1025) ("Amtrak's Response and Opposition"). Specifically, this Memorandum responds to the assertions made by counsel for the Judgment Creditors at the July 31, 2013 hearing (the "Hearing"). In short, Amtrak submits that the record shows that: (1) the Receivership was created for the benefit of the Judgment Creditors; (2) the Judgment Creditors' decision to pursue the appointment of the Receiver to operate Global NAPS and their subsequent unilateral agreement to continue operations led to the Receivership Estate incurring additional operating expenses and obligations, above and beyond those which existed before the Receivership, and for which it could not pay, to the detriment of the Receivership

---

[1] Amtrak incorporates by reference the matters set forth in its prior submissions to this Court, including, but not limited to, Docket Nos. 968 and 1025, as well as the Appendix filed concurrently herewith. Unless indicated otherwise, all capitalized terms have the meanings ascribed to them in Amtrak's Response and Opposition.

Estate and all of its creditors (other than the Judgment Creditors); and (3) these post-receivership operating expenses constitute the Receiver's "expenses" under the Receivership Order[2] and federal law.

## I.     The Receivership Was Created For The Benefit of the Judgment Creditors

The record in this case confirms that the Receivership was created solely to enhance the probability that the Judgment Creditors would collect upon judgments entered against Global NAPS and the remaining Judgment Debtors. Statements and representations to the contrary at the Hearing lack any reasonable factual basis, and should not be credited by the Court.

Specifically, counsel for the Judgment Creditors stated at the Hearing that "[t]he receiver was appointed and acted for the benefit of all creditors." (Hearing Tr. 51:3-4.) This is demonstrably inaccurate. In appointing the Monitor for the Judgment Debtors (the predecessor to the Receiver), the Court was clear that the Monitor's purpose was to "preserve both the [Judgment Debtors'] assets and the ability of [the Judgment Creditors] to satisfy their respective judgments." (Order Appointing Monitor at 3, Docket No. 589.) When the Judgment Creditors later requested that the Monitor be replaced with the Receiver, (*see* May 5, 2010 Hearing Tr., Docket No. 619, 6:4-15), the Court's Order of Appointment granting this request directed that "[n]inety percent of the Receivership Property shall be distributed to Verizon," and that "the remaining ten percent of the Receivership Property shall be distributed to SNET." (Receivership Order ¶ 13). The Judgment Creditors affirmatively opted for this remedy because they believed it would be in their best interests. (May 5, 2010 Hearing Tr. 10:15-18, 15:3-6 (noting that the Judgment Creditors had opted to "take [their] chances with the receiver" to attempt to recover the judgment amount, rather than attempting to "have the marshals or the sheriff start to sell [the

---

[2] Amended Order for Appointment of Keeper and Receiver, Docket No. 624.

Judgment Debtors' assets] off"); *see also* Verizon's Memo. in Response to the Receiver's Third Expedited Mot. for Further Instructions and Orders, Docket No. 710, Mar. 17, 2011 at 10 (stating that "Verizon did not move this Court for a general receivership. Rather . . . Verizon moved for a receiver to supervise the accounts of the Judgment Debtors only for so long as it took to marshal and monetize" assets to satisfy the Judgment Creditors' judgment).) The Receivership was instituted for the benefit of the Judgment Creditors, not Amtrak and others who were compelled to participate in it.

The Judgment Creditors may have meant to argue that the Receiver has acted, since his appointment, in a manner consistent with the best interest of the Receivership Estate as whole, and not simply as an extension of the Judgment Creditors. But, under federal receivership law, the Court must identify for whose benefit the receiver was appointed in the first place in determining whether that party should bear the responsibility for paying the receiver's expenses, not whether the receiver, once appointed, acted fairly. *See Bowersock Mills & Power Co. v. Joyce*, 101 F.2d 1000, 1002 (8th Cir. 1939). The receiver's post-appointment conduct is not relevant on this prong of the *Bowersock* test for determining whether, in equity, the party who requested his appointment should be liable for the receiver's expenses, or whether that party is entitled to stand on equal footing with other post-receivership creditors in receiving a pro rata share of distribution from the receivership estate at the termination of the receivership.

II. **The Judgment Creditors' Unilateral Agreement To Continue Operation Of Global NAPS Was Not To Create Value For Non-Judgment Creditor Post-Receivership/Administrative Creditors**

The Judgment Creditors' assertion at the Hearing that "[w]ithout the receiver, there wouldn't be anything here," in terms of funds remaining in the Receivership Estate, similarly demonstrates either a misunderstanding of the arguments advanced by third party post-

3

Receivership creditors ("Third Party Creditors") such as Amtrak, or another mischaracterization of established facts.

The Judgment Creditors never had any doubt that the Receiver would be *not* be able to liquidate Global NAPS for an amount even approaching the judgment owed to them. The Judgment Creditors acknowledged prior to the Receiver's appointment that, even if the Court appointed a receiver, "[t]here's no realistic chance that [Global NAPS and its affiliates are] going to sell for enough to cover [Verizon's] judgment or SNET's judgment or any of the other judgments that are floating around." (May 5, 2010 Hearing Tr. 7:2-4). It has always been apparent to all parties involved that the Receivership Estate would never be able to satisfy the pre-existing debts of Global NAPS. Thus, there is not, and has *never* been, any assets "here" available to Global NAPS' pre-Receivership, non-Judgment Creditors.

In seeking the appointment of the Receiver to maximize the Judgment Creditors' potential recovery, the Judgment Creditors understood that the Receiver would have to take on new, post-receivership expenses to Third Party Creditors in order to continue to operate Global NAPS. They also understood that Global NAPS had never paid the $2.7 million, on average, charged monthly for the Judgment Creditors' services. (Verizon's Opp'n to Frank Gangi's Mot. for Evidentiary Hearing and Discovery and in Response to [Proposed] Order Allowing Motions to Compel Payment and for Disclosure, Docket No. 860, at 3-4.) The Judgment Creditors took a calculated risk that the Receiver could create additional value for the Judgment Creditors, over and above the Receiver's own direct expenses and these newly generated post-receivership expenses that would be necessary in order to continue to operate Global NAPS. For example, Global NAPS could not have continued to operate and/or maximize its sale value as a going concern without having access to the Amtrak property where Global NAPS' fiber cables were

4

located.  (Mot. by Receiver, Carl F. Jenkins, for Authority to Employ Technology & Investment Consulting Company, Ex. A §1, Docket No. 627; Supp. Order to this Court's December 16, 2011 Order Authorizing the Sale of Certain Receivership Assets Free and Clear of All Liens, Claims, Interests and Encumbrances to Quality Speaks, LLC, Docket No. 827, Feb. 14, 2012.)  The Judgment Creditors' suggestion that the Third Party Creditors which provided new goods and services to the Receiver so the Receiver could continue to operate (for the Judgment Creditors' benefit) should consider themselves fortunate to be paid anything at all is preposterous.  These Third Party Creditors would have never agreed to provide such goods and services without the expectation that they would be paid before all pre-Receivership creditors from the revenue generated by the Receiver.[3]

The net effect of approving all of the Receiver's Recommendation is that the Third Party Creditors will have effectively been required to involuntarily donate over 92% of the value of their goods and services to the Judgment Creditors' judgment collection efforts.[4]  This is quite the opposite of creating value for "all" creditors, and authorizing this type of distribution would be grossly inequitable under the circumstances.  The Judgment Creditors knew that the value of the "services" it was providing to the Receivership Estate every month, which it claims ran in the millions of dollars: (1) would have rendered the Receivership Estate administratively insolvent

---

[3] The Judgment Creditors' assertion at the Hearing that the Receiver must get paid before all other creditors, "[o]therwise, you could never have a receiver," (Hearing Tr. 52:7-8), applies with equal force to the Third Party Creditors the Receiver had to do business with in order to continue to operate Global NAPS in Receivership.

[4] At the Hearing, counsel for the Judgment Creditors suggested that the $21 million settlement Verizon reached with the Judgment Debtors did not represent "real dollars," and thereby attempted to diminish the value that Verizon received from that settlement.  (Hearing Tr. 54:7-17.)  This runs directly contrary to the Judgment Creditors' prior statements to this Court that their judgment amount represented actual "real dollars."  (Mar. 31, 2011, Hearing Tr. 17:19-18:1, Docket No. 718 (counsel for the Judgment Creditors twice describing the Judgment Creditors' "judgment dollars" as "real dollars").)

from its inception, if those expenses were ever billed with the expectation of payment, and (2) were grossly disproportionate to the value of any return that the Judgment Creditors could have ever expected to receive back from the Receivership Estate.[5] As explained in the Response and Opposition, no reasonable business person would have ever sunk more than $100 million of real value into an administratively insolvent company that had approximately $3 million in assets, in the hopes of recovering on a pre-existing $57 million judgment. (Amtrak's Response and Opp'n at 14-18.) The Judgment Creditors cannot plausibly claim that the Receiver has created value for all Third Party Creditors, while simultaneously compelling those Creditors to subsidize their judgment collection efforts.

At the Hearing, the Judgment Creditors acknowledged that they considered asking the Court to terminate the Receivership because the Receiver would never be able to pay the millions of dollars per month that the Judgment Creditors were billing the Receiver for post-receivership expenses. (Hearing Tr. 55:3-4; *see also* Verizon's Opp'n to Frank Gangi's Mot. for Evidentiary Hearing and Discovery and in Response to [Proposed] Order Allowing Motions to Compel Payment and for Disclosure, Docket No. 842, at 6 (noting that Verizon continued to

---

[5] *See, e.g.*, Motion of the Universal Service Administrative Company (I) to Compel Receiver to Provide Accounting, (II) to Compel Receiver's Professionals to Submit Fee Applications, (III) to Prohibit Receiver From Further Transferring Receivership Property, and (IV) to Require the Receiver and/or Verizon to Pay Post-Receivership Claim, Docket No. 1016, July 8, 2013 ("USAC's Motion to Compel"), Exs. A-C (containing financial reports which the Receiver submitted to Verizon which showed that the ending monthly balance in the Receivership Estate's account had dropped from $1,483,855 at the end of May 2010, to $1,216,030 at the end of April 2012, before factoring in, or even mentioning, payments owed to certain post-receivership creditors such as Verizon); *see also* Verizon's Memo. in Opp'n to Arltek Holding, Inc.'s Mot. for an Injunction at 1-2, Docket No. 842 (noting Verizon had billed the Receivership more than $56 million in total, and $2.7 million per month, for post-receivership services which it knew the Receivership could not pay); Decl. of William G. Cummings, Feb. 27, 2012, Docket No. 842-1, ¶ 4 (stating that Verizon had billed Global NAPS over $56 million, none of which had been paid).

6

provide services to the Receivership at the Receiver's request, despite not having received any payment for those services).) After speaking with the Receiver, the Judgment Creditors claim they made the decision not to seek the termination of the Receivership, allegedly because litigating the issue of whether the Receivership should be terminated would be too costly or burdensome. (*Id.* 55:5-8.)[6] Regardless of the merits of this decision,[7] it is undisputed that it was *the Judgment Creditors' choice* to continue to provide services to the Receivership Estate in the hopes that the sale of Global NAPS as an operating concern would ultimately return more money to satisfy *Verizon's judgment*. *See Bowersock Mills*, 101 F.2d at 1004 (holding that the party which sought the receiver's appointment should bear the costs of a receivership that operated at a loss and was instituted for that party's benefit). Amtrak certainly never volunteered to take any reduction on its payment for post-receivership services provided to Global NAPS as contemplated under the Recommendation's proposed pro rata distribution.

---

[6] To the extent the Judgment Creditors have represented to the Court that the Receiver insisted on continuing to operate the Receivership even though the Receivership was losing millions of dollars per month, the Judgment Creditors have implicitly suggested that the Receiver is not entitled to recover his fees at all. *See Bowersock Mills & Power Co. v. Joyce*, 101 F.2d 1000, 1004 (8th Cir. 1939) ("When it has been demonstrated by actual experience, as in the instant case, that the business can not be conducted except at the expense of reasonable prudence, [the receiver] is bound, we think, to discontinue operations unless otherwise specifically directed by the appointing court.") (quoting *United States v. Johnson*, 98 F.2d 462, 466 (8th Cir. 1938)). Under such circumstances, the receiver must seek the approval of the Court and the receivership's creditors in order to continue to operate at a loss. *See id.*

[7] The Judgment Creditors' position that it would have been too expensive or onerous to litigate the issue is difficult to credit; the Judgment Creditors were faced with the choice of possibly spending thousands to litigate the termination of the Receivership, and continuing to provide millions worth of "services" *per month*, and chose to continue to provide services. The Judgment Creditors' actions are compelling evidence of whether they had any intent to seek repayment for these services it allegedly provided.

### III. The Judgment Creditors Have Not Demonstrated That The Receiver's Fees and Costs Are Entitled To Priority Over All Other Post-Receivership Creditors

The Judgment Creditors appear to view it as axiomatic that the Receiver's fees and costs (including the Receivership's legal fees and costs) must be paid first, before all other post-receivership expenses, likely in no small part because the Judgment Creditors interprets the Court's Receivership Order as imposing liability for these fees and costs on the Judgment Creditors in the event that the Receivership Estate cannot afford to pay them. (Hearing Tr. 52:7-8; Verizon's Memo. in Opposition to Frank Gangi's Mot. to Compel Payment of Receivership Expenses, Docket No. 831, Feb. 21, 2012, at 6.) However, the Judgment Creditors have not proven that this result is required by either the Receivership Order or federal receivership law.

First, the Receivership Order expressly directs the Receiver to "make payments solely for the ordinary course business expenses actually and reasonably incurred by Judgment Debtors and Judgment Debtors' subsidiaries." (Receivership Order ¶ 5.) While the Receiver is also "entitled to compensation for services rendered," the Receivership Order does not provide that the Receiver must be paid first, before all other expenses, nor does the Receivership Order even state that the Receiver's compensation must be paid from the Receivership Estate. (*Id.* ¶ 13.) To the contrary, the Receivership Order provides that "the Receiver may submit the Receiver's expenses to the parties for payment . . . as follows: 90 percent by Verizon, and 10 percent by SNET." (*Id.*)[8] There is absolutely nothing in the Receivership Order that supports Verizon's contention that the Receiver's fees and costs are entitled to some sort of super-priority over the other necessary ordinary operating expenses of the Receivership.

---

[8] The Judgment Creditors similarly paid the Monitor's expenses during the Monitor's tenure. (Verizon's Memo. in Response to the Receiver's Third Expedited Motion for Further Instructions and Orders, Docket No. 710, Mar. 17, 2011 at 6 n.4.)

8

Second, the cases cited by the Judgment Creditors do not compel the conclusion that the Receiver's fees are entitled to an absolute first priority. (*See* Verizon New England Inc.'s Opp'n to Universal Service Administrative Company's Mot. to Require Verizon to Pay Post-Receivership Claim at 9-10.) For example, in *Atlantic Trust Co. v. Chapman*, 208 U.S. 360 (1908), the Court set forth the general proposition that a receiver's expenses are usually charged against the receivership estate, but nowhere suggested that the receiver's fees were entitled to priority over the receivership's other operating expenses. Instead, the Court stated that the receiver's expenses that were entitled to priority included all "expenses incurred in its *operation and management*," not just the receiver's fees. *Id.* at 376 (emphasis added). Similarly, in *Bowersock Mills & Power Co. v. Joyce*, 101 F.2d 1000 (8th Cir. 1939), the court held that the plaintiff which sought the appointment of the receiver was liable for "*the actual losses* which its mistaken course [in seeking the receiver's appointment] has caused." *Id.* at 1003 n.4 (emphasis added); *see also Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) (receiver's fees and expenses included "services that were required either directly or indirectly by the order imposing the receivership"). A receiver's post-receivership creditors are every bit as essential to the continued operation of the receivership as the receiver himself, and should be entitled to the same priority of payment.

The Judgment Creditors have cited nothing in either the Receivership Order or federal receivership law in support of its position that the Receiver's fees and costs are entitled to priority over every other form of Receivership expense, including claims submitted by Amtrak. The fact is that the Receiver's expenses, including, but not limited to, his fees and costs, appear to dwarf the amount available for distribution. The Judgment Creditors, by their own admission, are liable for the Receiver's fees in the event the Receivership Estate cannot cover its

9

"expenses."[9] As a result, not only are the Judgment Creditors not entitled to share in the distribution from the remaining assets of the Receivership Estate before these expenses to Third Party Creditors are paid, *see Bowersock Mills*, 101 F.2d at 1004, but they are also liable for the Receiver's compensation under Paragraph 13 of the Receivership Order, as well as for the Receivership's legal fees and costs. (*See* Receiver, Carl F. Jenkins's Application for Authority to Employ Counsel, Docket No. 618, Ex. A; Joint Notice of Non-Opposition to Receiver, Carl F. Jenkins's Application for Authority to Employ Counsel, Docket No. 621, May 10, 2010).)

## CONCLUSION

For the foregoing reasons, the pro rata distribution scheme for post-receivership claims contemplated by the Judgment Creditors, and apparently by the Recommendation, as well as the 80% reduction of Amtrak's claim, should be rejected.

August 14, 2013

Respectfully submitted,

National Railroad Passenger Corporation
By its attorneys

/s/ Stephen E. Hughes
Stephen E. Hughes, BBO No. 629644
Bonner Kiernan Trebach & Crociata, LLP
200 Portland Street, Suite 400
Boston, MA 02114
(617) 426-3900
shughes@bonnerkiernan.com

and

Andrew Butz (admitted Pro Hac Vice)
Bonner Kiernan Trebach & Crociata, LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
(202) 712-7000

---

[9] Amtrak does not concede that the Receivership Order *only* requires the Judgment Creditors to pay the Receiver's fees in the event that the Receivership Estate is insolvent.

10

abutz@bonnerkiernan.com

and

Daniel Carrigan (admitted Pro Hac Vice)
McKenna Long Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7436
dcarrigan@mckennalong.com

11

## CERTIFICATE OF SERVICE

I hereby certify that I served on August 14, 2013, the within document(s) through the ECF system, and that copies will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Stephen E. Hughes
Stephen E. Hughes